Transcript of the Testimony of
**LARRY GAVIN**

**Date:** December 19, 2024

**Case:** ROGERS VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

LARRY GAVIN
December 19, 2024

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
KAVARIAN ROGERS,         )
                         )
         Plaintiff,      )
                         )
     -vs-                )  No. 24 CV 3739
                         )
THOMAS DART, SHERIFF OF  )
COOK COUNTY, ILLINOIS,   )
                         )
         Defendants.     )
```

Zoom deposition of LARRY GAVIN taken before DENNIS M. HARTNETT, CSR, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 2:00 o'clock p.m. on the 19th day of December A.D., 2024.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 2

1   There were present at the taking of this
2   deposition the following counsel:
3
4       THOMAS G. MORRISSEY, LTD.
        MR. PATRICK W. MORRISSEY
5       MR. THOMAS MORRISSEY
        10257 South Western Avenue
6       Chicago, Illinois  60643
        773-233-7901
7       pwm@morrisseylawchicago.com
8
            on behalf of the Plaintiff;
9
10      DEVORE RADUNSKY, LLC
        MR. JASON E. DEVORE
11      ZACHARY G. STILLMAN
        230 WEST Monroe Street
12      Suite 230
        Chicago, Illinois  60606
13      312-300-4479
        jdevore@devoreradunsky.com
14
15          on behalf of the Defendant,
            Thomas Dart;
16
17      COOK COUNTY SHERIFF'S OFFICE
        MS. KHARA COLEMAN
18      50 West Washington Street - 704
        Chicago, Illinois  60602
19      312-603-5473
        khara.coleman@ccsheriff.org.
20
21          on behalf of Defendant,
            Cook County, Illinois.
22
23              - - - - -
24

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 3

```
1               DEPOSITION OF
2               LARRY GAVIN
3             December 19, 2024
4
5   EXAMINATION BY:                          PAGE
6   Mr. Patrick Morrissey                       4
7
8               * * * * * *
9
                 EXHIBITS
10                                           PAGE
11  Deposition Exhibit No.  1                   4
12  Deposition Exhibit No.  8                   8
13  Deposition Exhibit No. 21                  18
14  Deposition Exhibit No.  4                  22
15  Deposition Exhibit No.  9                  34
16  Deposition Exhibit No. 16                  38
17  Deposition Exhibit No. 13                  48
18  Deposition Exhibit No. 14                  62
19
20              * * * * * *
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 1

LARRY GAVIN
December 19, 2024

Page 4

1                 LARRY GAVIN,
2 called as a witness herein, having been first duly
3 sworn, was examined upon oral interrogatories and
4 testified as follows:
5                EXAMINATION
6          by Mr. Patrick Morrissey:
7    MR. MORRISSEY:  Q  This is a 30(b)(6)
8 deposition, Rogers versus Dart, taken pursuant to
9 notice and continued to this date.  My name is Pat
10 Morrissey, I represent the Plaintiff.
11       Can you please state your name, sir.
12    **A**  **Larry Gavin.**
13    Q  Sir, what is your position with the
14 Sheriff's office?
15    **A**  **One of the First Assistant Executive**
16 **Directors.**
17    Q  Director, I'm going to show you Exhibit 1,
18 which is entitled Plaintiff's Rule 30(b)(6) notice.
19       Can you turn to the second page, please.
20 And you see there's paragraph 5?
21    **A**  **Yes.**
22    Q  Are you being produced today to discuss
23 paragraph 5 on behalf of the Sheriff's office?
24    **A**  **Yes.**

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 5

1    Q  Can you tell me what you did to prepare to
2 speak on this topic on behalf of the Sheriff's
3 office, and I don't need to know any conversations
4 you had with Counsel, but can you tell me what you
5 have done, other than meet with Counsel to prepare
6 for this?
7    **A**  **Nothing other than to meet with Counsel.**
8    Q  How many times did you meet with Counsel to
9 prepare for this topic?
10    **A**  **Twice.**
11    Q  And when was the first time?
12    **A**  **One day last week, I believe.**
13    Q  And, approximately, how much time did you
14 spend with Counsel preparing for topic 5?
15    **A**  **Somewhere, in total time, maybe between two**
16 **and four hours.**
17    Q  When you were preparing for topic 5, with
18 Counsel, did you review any documents?
19    **A**  **This document, number 5.**
20    Q  Did you review any other documents, other
21 than the Rule 30(b)(6) deposition notice?
22    **A**  **Yes.**
23    Q  What other documents did you review to
24 prepare?

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 6

1    **A**  **Just looked at the individuals in custody**
2 **who had cane and crutch alerts, who were housed in**
3 **Division 9.**
4    Q  This list identified people with walkers?
5    **A**  **Yes.**
6    Q  And when did you review this list?
7    **A**  **Tuesday, I believe.**
8    Q  And, approximately, how many people were on
9 this list?
10    **A**  **I didn't count.**
11    Q  More than 40?
12    **A**  **No.**
13    Q  Did this list identify people with general
14 alerts for canes, crutches, and walkers?
15    **A**  **I am not sure what you mean by general**
16 **alert.**
17    Q  Are you familiar with long distance only
18 alerts?
19    **A**  **Yes.**
20    Q  The list that you reviewed in preparation
21 for your testimony, did it identify people with long
22 distance only alerts.
23    **A**  **No.**
24    Q  Other than the list of people with alerts,

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 7

1 for a cane, crutch, or walker, and the Rule 30(b)(6)
2 notice, any other document you looked at to prepare
3 for testifying?
4    **A**  **No.**
5    Q  In preparation for testifying, did you tour
6 Division 9?
7    **A**  **No.**
8    Q  Topic 5, there's a sentence that says
9 explain with reasonable particularity why inmates
10 with medical alerts for a cane, crutch, or walker
11 would be assigned to Division 9, including the
12 accommodations for these individuals for toilet and
13 shower.
14       I want to first talk, Director, about why
15 somebody with a cane, crutch, or walker alert would
16 be assigned to Division 9?
17    **A**  **So individuals in custody who have a cane,**
18 **walker, or crutch alert for long distances only are,**
19 **can be and have been assigned to Division 9.  The**
20 **office, as a practice, does not look to house**
21 **individuals with the regular cane, crutch, and**
22 **walker alert in Division 9.**
23    Q  As a Sheriff's representative, what role
24 does the Sheriff have in providing an inmate with a

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 2

LARRY GAVIN
December 19, 2024

Page 8

1  cane, crutch, or walker?
2      A    The Sheriff doesn't have any role.  Our
3  medical partners, Cermak Health Services, were on
4  site at the facility, does our medical screenings of
5  our population, and based on medical and/or mental
6  health need, they facilitate that device to the
7  population.
8      Q    I'm showing you Exhibit 8, which is a
9  declaration from Sabrina Trevizo, Director.  Do you
10 know Sabrina Trevizo?
11     A    I do.
12     Q    Who is she?
13     A    She's the Sheriff's ADA compliance officer.
14     Q    In preparing for your deposition today, did
15 you speak with her?
16     A    No.
17     Q    I want to direct your attention to the
18 second page, paragraph 5.  Do you see where
19 Miss Travizo says, I am also familiar with the role
20 of medical providers employed by Cermak Health
21 Services in assessing and identifying individuals
22 with disabilities in the CCDOC.  Cermak's
23 identification of disabilities or mobility
24 restrictions is critical to my work in helping to

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 9

1  accommodate the needs of individuals in our custody,
2  do you see that?
3      A    Yes.
4      Q    As the Sheriff's representative, do you know
5  why a Cermak medical provider would assign a person
6  a walker?
7      MR. DEVORE:  Objection, speculation, calls for
8  speculation, form.
9      THE WITNESS:  I am security, I have no medical
10 background whatsoever, so, no, I would not know.
11     MR. MORRISSEY:  Q  As the Sheriff's
12 representative, would the Sheriff understand why a
13 Cermak medical doctor prescribed a person a long
14 distance cane, crutch, or walker?
15     MR. DEVORE:  Objection, form, it's also outside
16 the scope of the notice.
17     THE WITNESS:  Answer?
18     MR. DEVORE:  Yes.  If you can.
19     THE WITNESS:  Can you ask the question again,
20 please?
21     MR. MORRISSEY:  Q  As the Sheriff's
22 representative, would the Sheriff's office know why
23 a Cermak medical provider entered an alert for a
24 person to use a cane, crutch, or walker long

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 10

1  distance?
2      A    No, we're not privy to the diagnoses of the
3  individuals in custody, if it's not related to a
4  matter of security.  So, primarily we're not
5  notified of the specific diagnosis of any individual
6  in custody.
7      Q    And is it fair to say the Sheriff defers to
8  the Cermak medical professionals to identify people
9  who have a mobility disability?
10     A    We defer to Cermak for all medical and
11 mental health diagnoses and treatments, yes.
12     Q    How was the Sheriff's office alerted if an
13 individual has a mobility restriction?
14     MR. DEVORE:  Objection, form.
15     THE WITNESS:  I don't know if we're notified
16 that someone has a mobility restriction.  We have a
17 Jail Management System that interfaces with Cermak
18 Cerner System, Cermak employees utilize their system
19 to place the corresponding alert into their system,
20 which, in turn, feeds into our system.  But, again,
21 I don't know if we co-relate someone having some
22 type of defined mobility issue with any
23 corresponding alert.  We just acquiesce to the
24 recommendations to our medical partner and ensure

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 11

1  that the individual in custody has or is in
2  possession of what they need.
3      MR. MORRISSEY:  Q  So, going back to paragraph
4  5, which is Exhibit 8 of Miss Travizo's declaration,
5  do you see where it says that the role of the
6  medical providers employed by Cermak Health Services
7  in assessing and identifying individuals with
8  disabilities in the CCDOC?
9      A    Yes.
10     Q    As a Sheriff's representative, how does, how
11 do the Cermak Health Services professionals identify
12 to the Sheriff's office an individual with a
13 disability?
14     A    Same question that you just asked, they
15 utilize their JMS system, which, I mean their
16 system, which interfaces with our system, and the
17 corresponding alert, but, again, I don't, we don't
18 correspond, necessarily, an alert to a diagnosis.
19         So, if an individual in custody needed a
20 cane, I don't know if, as an office, we have deemed
21 him to be disabled, because we don't have access to
22 the medical diagnosis.  We just make sure that we
23 are adhering to the recommendation of our medical
24 partner.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 3

LARRY GAVIN
December 19, 2024

Page 12

```
 1    Q   So is the same true if somebody has crutches
 2  or a walker?
 3    A   That is correct.
 4    Q   And the Sheriff's office doesn't make a
 5  determination whether or not one of these
 6  individuals is disabled or not, is that true?
 7    A   We do not make that determination, that's
 8  correct.
 9    Q   And as the Sheriff's representative, you
10  defer to the Cermak medical staff to make that
11  determination?
12    MR. DEVORE:  Objection, form, asked and
13  answered.
14        You can answer.
15    THE WITNESS:  Yes.
16    MR. MORRISSEY:  Q  When a Cermak medical
17  provider from May 8, 2022 to the present, says an
18  individual can use a cane, crutch, or walker long
19  distance, in Division 9, what does that mean to the
20  Sheriff's office?
21    MR. DEVORE:  Objection, form, incomplete
22  hypothetical.
23    THE WITNESS:  Our medical partners does not say
24  that an individual in custody can use a cane,
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 13

```
 1  crutch, or walker for long distances in Division 9.
 2  Our medical partners enter an alert into their
 3  system, which interfaces with our Jail Management
 4  System, and that alert would alert us as to the
 5  constraints of the particular alert in question.
 6        So, if an individual in custody receives a
 7  cane, crutch, or walker alert for long distances
 8  only, the office uses that alert, just like other
 9  alerts, to determine house, based on security and
10  medical need.
11    MR. MORRISSEY:  Q  As the Sheriff's
12  representative from May 8th, 2022 to the present,
13  does the Sheriff house people with long distance
14  cane, crutch, and walker alerts in Division 9?
15    A   Yes.
16    Q   Now, from May 8th, 2022 to the present, as
17  the Sheriff's representative, do you know whether
18  there are any grab bars around any of the inmate
19  toilets in Division 9?
20    A   Not to my knowledge, no.
21    Q   As the Sheriff's representative, from May 8,
22  2022 to the present, are there any grab bars in any
23  of the inmate's shower rooms in Division 9?
24    A   Not to my knowledge, no.
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 14

```
 1    Q   From May 8, 2022 to the present, are there
 2  any seats in the Division 9 shower room for inmates
 3  to use?
 4    A   Not to my knowledge, no.
 5    Q   Are there any portable chairs, from May 8,
 6  2022 to the present, for inmates that have a cane,
 7  crutch, or walker alert, long distance, to use in
 8  Division 9?
 9    A   We have portable chairs on the compound, I
10  am not sure if we have any portable chairs in
11  Division 9.
12    Q   From May 8, 2022 to the present, are there
13  any signs in Division 9 that say an inmate with a
14  cane, crutch, or walker, long distance alert, may
15  use a portable chair in the shower room?
16    MR. DEVORE:  Objection, it's outside the scope
17  of the notice.  So are the prior three, but this one
18  is as well.
19    MR. MORRISSEY:  That's a lot of accommodations.
20    MR. DEVORE:  Meaning accommodation.
21    MR. MORRISSEY:  Right.
22    MR. DEVORE:  Go ahead.
23    THE WITNESS:  Can you ask it again, please.
24    MR. MORRISSEY:  Dennis, can you please read back
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 15

```
 1  the question.
 2        (Question read back as requested.)
 3    THE WITNESS:  Not to my knowledge.
 4    MR. MORRISSEY:  Q  You mentioned, Director, that
 5  there is or are some portable chairs in the compound
 6  to use in the shower?
 7    A   Yes.
 8    Q   Describe the chairs that you're aware of in
 9  the compound.
10    MR. DEVORE:  Objection, form.
11    THE WITNESS:  Just standard medical shower
12  chairs.
13    MR. MORRISSEY:  Q  Are there wheels on those
14  chairs?
15    A   Yes.
16    Q   Can you describe the size of those wheels?
17    A   No.
18    Q   When is the last time you saw one of those
19  chairs?
20    A   When I was in the RTU making rounds.
21    Q   Have you ever seen one of those chairs in
22  Division 9?
23    A   No.
24    Q   If one of those chairs is used in the
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 4

LARRY GAVIN
December 19, 2024

Page 16

1  compound, is the use of the chair required to be
2  documented?
3       A    No.
4       Q    Describe the protocol to use one of those
5  portable shower chairs in the compound between
6  May 8, 2022 and the present?
7       A    I don't know if there is a protocol in our
8  medical facility for housing in the RTU or in our
9  Cermak area, where individuals in custody have an
10 advance medical need, shower chairs are available to
11 the population as needed.
12      Q    To use one of those chairs, does the
13 individual have to request the chair?
14      A    Yes, from the officer.
15      Q    And after the individual uses the chair, is
16 he or she supposed to give the chair back to the
17 officer?
18      A    Yes.
19      Q    Do you have any knowledge, between May 8,
20 2022 and the present, whether that ever was used in
21 Division 9?
22      A    No.  No, I know the chairs are not used in
23 Division 9.
24      Q    And why do you say that, Director?

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 17

1       A    Because we use the chairs in the RTU and in
2  Cermak.
3       Q    Now, you mentioned inmates with an alert to
4  use a cane, crutch, or walker full time are also
5  housed in Division 9?
6       A    I didn't mention that, that's not what I
7  said.
8       Q    Oh, I'll ask you a different question.
9            Are individuals that use a cane, crutch, or
10 walker full time assigned to Division 9 between
11 May 8, 2022 and the present?
12      A    As I previously said, as a practice, we do
13 not.  Our central classification unit, which is
14 responsible for tiering individuals in custody to
15 the living units and cells across the compound, we
16 do not, as a practice, house individuals in custody
17 who have the general cane, crutch, or walker alert.
18      Q    Why?
19      MR. DEVORE:  Objection, form.
20      THE WITNESS:  That's just not what we do, from a
21 classification perspective.  Division 9 doesn't have
22 the grab bars for the shower, and we don't have the
23 shower chair over there for an individual who would
24 need full-time possession of those devices.

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 18

1       MR. MORRISSEY:  Q  I'm going to show you,
2  Director, Exhibit 21, which is a series of e-mails.
3       MR. DEVORE:  Have these been produced?
4       MR. MORRISSEY:  It has.  It was produced when we
5  were conferring about the scope of this topic.
6       Q    Now, Director, I'm showing you what's marked
7  as Exhibit Number 21.
8       MR. DEVORE:  Is it numbered anywhere?
9       MR. Morrissey:  No.
10      MR. DEVORE:  Do we have one that's numbered?
11      MR. MORRISSEY:  I produced it to you.
12      MR. DEVORE:  Okay.
13      MR. MORRISSEY:  Q  I'm showing you, Director,
14 Exhibit 21, can you see there's an email from
15 Dr. Andrew DeFuniak?
16      MR. DEVORE:  Wait, I'm just trying to identify
17 what this is from --
18      MR. REPORTER:  I'm sorry, Counsel, I can't hear
19 you.
20      MR. DEVORE:  I'm just trying to identify this
21 document.  I'm trying to figure out how it fits into
22 the topic.  It's not clear right now.
23      MR. MORRISSEY:  Q  Director, do you see your
24 name on that email?

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 19

1       MR. DEVORE:  Wait.  And, for the record, this
2  looks like it's an email from Andrew DeFuniak, dated
3  February 10, 2022, 5:00 p.m. to a number of people,
4  regarding M3 review for division or div 2, dorm 2
5  housing, five pages.  Okay.
6       MR. MORRISSEY:  Q  Director, do you see your
7  name on that email?
8       A    Yes.
9       Q    And from May 8th, 2022 to the present, is it
10 the practice of the Sheriff's office to collaborate
11 with doctors from Cermak to identify whether certain
12 inmates may be moved to various divisions within the
13 compound?
14      MR. DEVORE:  Objection as to form.
15      THE WITNESS:  We collaborate with our medical
16 partners when we reach capacity in some of our
17 areas, to ensure that they're not objecting to our
18 housing decision, based on medical need.
19           So there is a collaborative methodology to
20 working with Cermak relative to our individuals in
21 custody who have that extended or an advance medical
22 and/or psychological need.
23      MR. MORRISSEY:  Q  And between May of 2022 and
24 the present, before an inmate is placed in

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 5

LARRY GAVIN
December 19, 2024

Page 20

segregation in Division 9, there's also a collaboration between the Department of Corrections and the medical staff, correct?
    MR. DEVORE:  Objection as to form.
    THE WITNESS:  We don't have any segregation.
    MR. MORRISSEY:  Q  Is there a restrictive housing unit in Division 9?
    **A   We do have restrictive housing units.**
    Q   And before placing an individual in restrictive housing, is there a collaboration between the DOC and the medical staff regarding whether it's appropriate to put somebody in the unit, given his medical condition?
    **A   No.**
    Q   As the Sheriff's representative, from May 8th of 2022 to the present, has the Sheriff's office ever told the County Medical Staff that Division 9 doesn't have accessible toilets and showers?
    MR. DEVORE:  Objection, form, calls for speculation.
    THE WITNESS:  Yeah, I am not privy to every discussion that the offices have with our medical partners, so I couldn't answer that.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 21

    MR. MORRISSEY:  Q  Between May 8th, 2022 and the present, as the Sheriff's representative, has the Sheriff's office told Cermak that the toilets and the showers do not have grab bars?
    MR. DEVORE:  Objection, form, calls for speculation.
    THE WITNESS:  Yeah, it's the same thing.  I am not privy to every single communicative interaction that the office has with Cermak, so for me to answer would be speculative.
    MR. MORRISSEY:  Q  Between May 8, 2022 and the present, if an individual has a general alert for cane, crutch, or walker, can he use the device in the living unit?
    **A   Yes.**
    Q   Under what circumstances?
    **A   As he or she would need the device, but, again, as a general practice, we do not house individuals in custody who are in need of cane, crutch, and walker alerts in Division 9.**
         (Whereupon the connection disengaged from
         2:28 until 2:54.)
         (Last question and answer read back.)
    MR. DEVORE:  There were several questions and

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 22

answers, after Dennis dropped off, is my recollection.  Mr. Devore, do you have any --
    MR. DEVORE:  I am not sure.
    MR. MORRISSEY:  I think there were some questions, so I may re-cover territory, I think we may have covered when you dropped off, okay.
    Q   Director, if a person with a cane, crutch, or walker alert is assigned to Division 9, and can use that device at all time, based on the County Medical staff's alert, is that person allowed to use a device in the living unit in Division 9?
    **A   So, again, the customary practice is not to assign individuals in custody with, who have been ordered to the general cane, crutch, or walker alert to Division 9.**
    Q   In preparation for your testimony, did you look at any records from Mr. Hernandez?
    **A   No.**
    Q   I'm showing you, Director, Exhibit 4, which is a medical record for Mr. Hernandez, and at the bottom of that medical record, there's a note by Nurse Jalene Macrae, (phonetic) and it talks about PT, it does have an order for a cane at all times.  Div 9 will not allow PT to have cane on the deck.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 23

Do you see that?
    MR. DEVORE:  Objection, it's outside the scope of the notice.  Unless you can explain how it is inside.  So where, and you're pointing at where again?
    MR. MORRISSEY:  Q  The nursing progress note.  The last few sentences, it says PT does have an order for a cane at all times.  Div 9 will not allow PT to have his cane on the deck.  Communication sensitive provider for appropriate housing.  Do you see that, Director?
    **A   Yes.**
    Q   In Division 9, between May 8, 2022 and the present, if a patient has a prescription for a cane at all times, would you agree that the practice in Division 9 is not to allow the individual to use the cane within the housing unit?
    **A   If the individual had a cane at all times, the practice is to not house the individual in Division 9.  That's the practice.  So, I can't speak to this particular individual in custody and the circumstances which medical partners gave him the cane to utilize.**
         But to say, excuse me, but to say that if

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 6

LARRY GAVIN
December 19, 2024

Page 24

1  he received the cane, if he was to receive the cane
2  alert after being housed in the division, which
3  often happens, if he went to a medical appointment,
4  and was given the medical device, customarily the
5  staff in Division 9, as a rule, would take the
6  medical device and not allow the medical device on
7  the tier, for security purposes.  Once the
8  individual in custody or once it's known by security
9  that this individual is to be in need of the cane at
10 all times, then appropriate housing provisions are
11 to be had.
12      Q   Is Division 9 an appropriate housing for a
13 person who uses a cane at all times?
14      MR. DEVORE:  Objection, calls for medical
15 conclusion.
16      THE WITNESS:  Again, we do not house, as a
17 general practice, individuals in Division 9 who have
18 the general cane, crutch, or walker alert.
19      MR. MORRISSEY:  Q  From May 8, 2022 to the
20 present, has the Sheriff's office told that to
21 Cermak medical staff?
22      MR. DEVORE:  Objection, calls for speculation.
23      THE WITNESS:  I am not privy to every single
24 conversation that someone from the office would have

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 25

1  had with Cermak, but to say that there are, there's
2  a collaborative effort to work with our medical
3  partners, but there are anomalies.  If an individual
4  in custody started the day with no alert, goes to a
5  medical appointment and comes back with a cane, then
6  someone from our side would need to understand the
7  way in which that cane was to be utilized.
8           So there are anomalies where individuals in
9  custody could land in Division 9, with a general
10 cane, crutch, or walker alert, but once our central
11 classification unit is made aware, then we would
12 adjust the individual's in custody's housing to
13 accommodate the need for the individual to be in
14 possession of his medical device at all times.
15      Q   From May 8, 2022 to the present, has the
16 medical staff at Cermak told the Sheriff's office
17 what it means if a person has a cane long distance
18 only?
19      MR. DEVORE:  Objection, form, calls for
20 speculation.
21      THE WITNESS:  No.
22      MR. MORRISSEY:  Q  Has the Sheriff -- strike
23 that.
24           Same question for people with crutches?

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 26

1      A   No.
2      Q   Has the County medical staff, from May of
3  2022 to the present, told the Sheriff the
4  limitations of somebody who uses crutches long
5  distance only?
6      A   No.
7      Q   How about a walker long distance only, from
8  May of 2022 to the present, has the medical staff
9  told the Sheriff's office the limitations somebody
10 may or may not have, who uses a walker long distance
11 only?
12     A   No.
13     Q   If a person is prescribed a walker long
14 distance only, and is in Division 9, does the
15 Sheriff's office consider that person not disabled?
16     MR. DEVORE:  Objection, calls for a medical
17 opinion.
18     THE WITNESS:  I don't know how the Sheriff, how
19 we define disabled, because I'm not a medical
20 professional.  So it would, I wouldn't be
21 comfortable speculating as to whether someone was
22 actually being disabled.  Speaking from the, from
23 the point that the individual in custody is in need
24 of his or her walker for long distances, we're

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 27

1  responsible for ensuring that that device is
2  available to them when they need to go long
3  distances.
4      MR. MORRISSEY:  Q  From May of 2022 to the
5  present, if someone needs a walker for long
6  distances, from the Sheriff's perspective, does the
7  person need a grab bar to get on or off the toilet?
8      MR. DEVORE:  Objection, calls for a medical
9  opinion.
10     THE WITNESS:  Again, not being a medical
11 professional, I'm not really comfortable speaking to
12 what ancillary devices are necessary for an
13 individual, based on diagnosis that I don't know
14 anything about.  So we're not privy, again, to
15 specific medical diagnoses relative to the
16 individual in custody's need for a medical device.
17     MR. MORRISSEY:  Q  What about if there's a long
18 distance alert for a cane, crutch, or walker and
19 shower, does that person, from the Sheriff's
20 perspective, need a grab bar to shower?
21     MR. DEVORE:  Objection, calls for -- or calls
22 for a medical opinion.
23     THE WITNESS:  Yeah, my answer would still be the
24 same, because I'm not privy to the specificity of

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 7

LARRY GAVIN
December 19, 2024

Page 28

the medical diagnoses, therefore, my role is to ensure that the individual in custody has the medical device, based on the recommendation of our medical partner, is in possession for long distance, to your question.

MR. MORRISSEY: Q From May of 2022 to the present, how does the medical staff tell the Sheriff's office if a person with a long distance only alert needs a grab bar by the toilet or the shower?

A Again, we utilize the two systems to talk to one another, we're not, we're not privy to individual medical notes, their chart, or any of those subcommunications relative to someone's diagnosis. We're responsible for adhering to the, to the general alert, which, in this case, we're discussing someone having access to a medical device for long distances.

Q But how does the Sheriff's office know whether the person, a person with that type of an alert, a long distance only alert for a cane, crutch, or walker needs a grab bar?

MR. DEVORE: Objection as to form, it calls for a medical opinion.

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 29

THE WITNESS: We would not know.

MR. MORRISSEY: Q Is there any alert that the County medical staff could enter to notify the Sheriff's office, between May of 2022 and the present, that the person needs a grab bar by the toilet or shower?

MR. DEVORE: Objection, calls for speculation.

THE WITNESS: Our medical partner does not currently have a medical alert that notifies the office that someone is in need of a grab bar.

MR. MORRISSEY: Q Same question for seats in the shower. From May of 2022 to the present, as the Sheriff's representative, is there any alert that the County can convey to the Sheriff's office that an individual with an alert for a cane, crutch, or walker long distance needs a seat in the shower?

MR. DEVORE: Objection as to form.

THE WITNESS: Same answer, that there are currently no alerts in, that are being pushed to our Jail Management System, that makes the office aware of someone's need for a grab bar or a shower chair.

MR. MORRISSEY: Q So how does the Sheriff's office know, from May of 2022 to the present, whether an individual with an alert for a long

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 30

distance cane, crutch, or walker needs a grab bar in the toilet?

A Because we have a residential treatment unit and we have a Cermak building for individuals in custody with advanced medical and mental health needs, and those devices are stored in those areas for use by the population.

Q I'm talking, Director, about somebody with a long distance cane, crutch, or walker, who is assigned to Division 9?

A No, we were just talking about someone who would need access to a grab bar or a shower chair, that's what you just asked me.

Q Well, Director, from May of 2022 to the present, how does the Sheriff's office know whether or not one of the 109, 103 people who are in Division 9 with a cane, crutch, or walker alert, whether those individuals need a grab bar by the toilet?

A Again, there are currently no systems in place where Cermak makes us aware that someone, who would be housed in Division 9, would need access to a grab bar or shower chair.

Q In the Sheriff's office, as a practice,

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 31

would not put somebody within a general alert for a cane, crutch, or walker in Division 9, correct?

A That is correct.

Q And part of that reason is because there are no grab bars around the toilets and in the showers?

MR. DEVORE: Objection, mischaracterizes prior testimony. You can answer.

THE WITNESS: That is because of the level of security acuity that an individual in custody would not be in Division 9 and maintain possession of their cane, crutch, or walker, for the safety and security of that particular building.

MR. MORRISSEY: Q Then why does the Sheriff's office, during this period, allow long distant only people to be in Division 9?

A Because the individuals in custody who have long distance only medical devices are able to utilize the medical device until they reach their living unit. Any time they are exiting their living unit, for off-site movement, they are given their respective medical devices for use in accordance with the corresponding medical alert.

Q So from May of 2022 to the present, what type of accommodation is provided by the Sheriff's

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 8

LARRY GAVIN
December 19, 2024

Page 32

1  office for that person to use the toilet?
2      MR. DEVORE:  Objection as to form.
3      THE WITNESS:  The individuals use the restroom,
4  there's not an alert that deals with any particular
5  restriction for someone being able to use the
6  restroom or shower when they have a long distance
7  cane, crutch, or walker alert.
8      MR. MORRISSEY:  Q  My question, Director, is
9  more broad.  What accommodation is provided by the
10 Sheriff's office for one of those people who has a
11 cane, crutch, or walker alert long distance?
12     A   Meaning they have access to a toilet and
13 they have access to the shower in the facility.
14     Q   Is there any assisted devices that are given
15 to those people to get on or off the toilet?
16     A   No.
17     Q   Are the individuals given the cane, crutch,
18 or walker upon request in their cell to get on or
19 off the toilet?
20     A   No.
21     Q   How about if a person with a long distance
22 walker alert is assigned to the upper deck of a
23 living unit in Division 9, what accommodation is
24 provided to that individual to get down the stairs

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 33

1  to use the shower?
2      MR. DEVORE:  Objection, incomplete hypothetical,
3  calls for speculation.
4      THE WITNESS:  Yeah, all of the stairwells have
5  the handrails for usage for people who are coming up
6  and down the steps.
7      MR. MORRISSEY:  Q  Other than the handrails to
8  get up or down the steps, if an individual has a
9  long distance walker only alert, any other
10 accommodation for that person to get to the shower
11 room?
12     A   No.
13     Q   How about once inside the shower room, what
14 type of accommodation is provided to an individual
15 who has a walker long distance only alert once he is
16 inside the shower?
17     A   None to my knowledge.
18     Q   So there are no chairs in the Division 9 for
19 a person with a long distance walker only alert to
20 sit down while showering?
21     A   As previously asked and answered, we do not
22 have shower chairs in Division 9.
23     Q   And if an individual has a long distance
24 only alert, and is seeking to take a shower in

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 34

1  Division 9, the officer will not give the individual
2  his device while he's showering; is that true?
3      MR. DEVORE:  Objection, asked and answered.
4      THE WITNESS:  That is true.
5      MR. MORRISSEY:  Q  And there's nothing affixed
6  in Division 9 walls that provide a grab bar support
7  for that person to shower?
8      MR. DEVORE:  Objection, form.
9      THE WITNESS:  Asked and answered.  No.
10     MR. MORRISSEY:  Q  And from May of 2022 to the
11 present, is medical staff available to help the
12 person shower in Division 9?
13     MR. DEVORE:  Objection, form, as to available.
14     THE WITNESS:  Medical staff is available in
15 Division 9, there's always medical staff in the
16 dispensary, but customarily, as operations go, no,
17 they do not come to the tiers to help individuals in
18 custody shower.
19     MR. MORRISSEY:  Let's take a five minute break.
20         (Whereupon a break was taken at 3:12.)
21         (Back on the record at 3:20.)
22     MR. MORRISSEY:  Q  Director, I'm going to show
23 you Exhibit 9, which is a series of grievances that
24 have been produced in this case.  And I want to

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 35

1  direct your attention, Director, to Exhibit 9, page
2  5, which is a grievance by Mr. Rogers, control
3  number 2023X13269.  Let me know when you're there.
4      A   I'm there.
5      Q   And do you see this is a grievance by
6  Mr. Rogers where he's complaining about showering in
7  Division 9?
8      A   Uh-huh.
9      Q   And that's a yes?
10     A   Oh, I'm sorry, yes, yes.
11     Q   And the concern about the lack of railings
12 in the shower room, and the lack of balance?
13     A   I'm looking for where he's saying lack of
14 rails.
15     Q   The last sentence, there's no rails in
16 shower, and a few lines above that, it says, I don't
17 have control of my balance.
18     A   You said the last sentence there's no rails,
19 yes, okay, I see it.
20     Q   And the response is by Sabrina
21 Rivero-Canchola, where she mentions the issue has
22 been previously addressed.  Do you see that?
23     A   Yes.
24     Q   And it also says that Detainee Rogers is

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 9

LARRY GAVIN
December 19, 2024

Page 36

1  general population, according to medical
2  classification assigned to him by Cermak.  Do you
3  see that?
4      A   Yes.
5      Q   For people in Division 9, that use a cane,
6  crutch, or walker, either at all times or long
7  distance, how does the Sheriff, how does Cermak tell
8  the Sheriff's office the person is general
9  population?
10     MR. DEVORE:  Objection, asked and answered.
11     THE WITNESS:  We utilize the alerts, again, that
12 are given to us from Cermak to make decisions on
13 housing, relative to Cermak's recommendation, via
14 medical alert.  If, at any time, those conditions
15 need to be adjusted, if anything changes that we're
16 made aware of, if there's a housing issue relative
17 to someone's ability, level of ambulatory ability,
18 we will adjust the housing.
19          So, primarily, we utilize the medical
20 alerts that were given from our medical partner who
21 has assessed who we assume or presume, I should say,
22 has assessed the individual in custody's level of
23 ambulatoriness, that's a word.  And we, on the other
24 hand, internalize the alert that the medical partner

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 37

1  places in their system, which feeds our system, and
2  we correlate that with the security and housing
3  need, based on that.
4      MR. MORRISSEY:  Q  So the Sheriff, so going back
5  to the question on general population, according to
6  the medical classification, how does medical tell
7  the Sheriff's office that a person is general
8  population?
9      MR. DEVORE:  Objection, asked and answered.
10     THE WITNESS:  Based on the medical alert that
11 corresponds to the individual in custody.
12     MR. MORRISSEY:  Q  So if a person has a long
13 distance walker, is that considered general
14 population to the Sheriff's office?
15     A   Yes.
16     Q   How about if somebody has a cane alert at
17 all times, is that considered general population to
18 the Sheriff's office?
19     A   No.
20     Q   Why not?
21     **A   Because we do not allow, as a practice, in**
22 **the office, as previously asked and answered,**
23 **individuals in Division 9 to have a cane, crutch, or**
24 **walker on their person at all times.**

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 38

1      Q   In the context of Mr. Rogers, when he's
2  complaining about showering, and a lack of balance
3  in the grievance, what type of accommodations are
4  available for the Sheriff's office to help him?
5      **A   We help him by giving him an inter-agency**
6  **health service request form, allowing him to see the**
7  **doctor, where the doctor can determine if he is not**
8  **ambulatory enough to be housed in the general**
9  **population.  And we would receive that notification**
10 **by way of medical alert, which our central**
11 **classification unit would then assess the individual**
12 **in custody's elevated medical need against the**
13 **security and safety of the institution and house him**
14 **accordingly.**
15     Q   I show you an FY19 business case,
16 Exhibit 16.  It was prepared by Miss Sabrina
17 Rivero-Canchola, it's dated 4-3-2018.
18     MR. DEVORE:  Objection, this is outside the
19 scope of the notice.  It's four years, several years
20 prior to the date range we're talking about.  It's
21 not articulated in the notice at all.
22     MR. MORRISSEY:  Q  Do you see, on the second
23 page, Director, where it talks about detainees with
24 mobility disabilities that require auxiliary aids,

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 39

1  but do not require medical housing or housed in
2  Divisions 2, 4, 6, 9 and 10, the only ADA housing,
3  housing that complies with 2010 design standards
4  that currently exist for detainees with mobility
5  impairment is RTU and Cermak, do you see that?
6      A   No, I can't stipulate to that, because this
7  writing is very small, I can't see that.
8      Q   I'll show it to you on the computer.
9      A   Okay.
10     Q   I'm showing you Exhibit 16, on my computer,
11 I think it's the first page there.
12     MR. DEVORE:  What's the date on this document?
13     MR. MORRISSEY:  Q  It's dated 4-3-2018.  Do you
14 see that, Director?
15     A   Yeah.
16     Q   And you see it was prepared by Sabrina
17 Rivero-Canchola?
18     A   Yeah.
19     Q   And if we go to the second page, it talks
20 about detainees with mobility disabilities that
21 require auxiliary aids, but do not require medical
22 housing for housing in Divisions 2, 4, 6, 9, and 10,
23 do you see that?
24     A   Uh-huh.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 10

LARRY GAVIN
December 19, 2024

Page 40

```
 1   Q   That's a yes?
 2   A   Yes, I'm sorry, yes.
 3   Q   And it continues, the only ADA housing,
 4  housing that complies with 2010 design standards
 5  that currently exist for detainees with mobility
 6  impairments is the RTU and Cermak.  Do you see that?
 7   A   Yes.
 8   Q   And it continues, the ADA requires us to
 9  house detainees in the most integrated settings,
10  having no ADA compliant housing, other than division
11  8 and 08 severely restricts our ability to house
12  detainees in the most integrated setting while
13  making sure they have access to accessible cells,
14  toilets, and showers.  This creates difficulties
15  with bed control and also leads to litigation.
16       Did I read that correctly?
17   A   Yes.
18   Q   So, going back to Mr. Roger's grievance,
19  where there's a reference to general population and
20  medical classification, you said it was, in essence,
21  that Mr. Rogers had requested medical staff to be
22  moved?
23   MR. DEVORE:  Objection, mischaracterizes his
24  testimony.
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 41

```
 1   THE WITNESS:  That's not what I said.
 2   MR. MORRISSEY:  Q  Let me ask.  Let's assume,
 3  let's assume Mr. Rogers was housed in Division 9 in
 4  August of 2022, he was seeking an accommodation of
 5  toilet and shower, what was the procedure for the
 6  Sheriff, the Sheriff's procedure for Mr. Rogers to
 7  have access to a shower with a grab bar?
 8   MR. DEVORE:  Objection, as to scope, outside the
 9  time, timeframe of May 2022 forward, not within the
10  scope of the notice.
11   MR. MORRISSEY:  Q  And the time period is
12  August 2023.
13   MR. DEVORE:  2023, okay, my apologies.
14   MR. MORRISSEY:  Q   Within the time period and
15  without accommodations for a person like Mr. Rogers,
16  whose claiming he's in Division 9, he doesn't have a
17  bar to help him shower.
18       So, according to the Sheriff, what
19  accommodation would the Sheriff have for Mr. Rogers,
20  if he wanted a grab bar to help him shower.
21   A   The Sheriff is going to allow the individual
22  in custody to have access to medical care.  The
23  determination is not made by the Sheriff as to how
24  ambulatory an individual in custody is or isn't.  If
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 42

```
 1  our medical partners makes the recommendation that
 2  the individual in custody has an elevated level of
 3  medical care, then the Sheriff will acquiesce and
 4  provide that elevated housing to accommodate the
 5  elevated medical care that's being requested by the
 6  medical partner.
 7   Q   But what if somebody -- what do you mean by
 8  medical care, elevated medical care?
 9   A   Meaning that, in addition to the medical
10  alert, that the individual in custody already had,
11  if the medical partner deemed that that was not
12  suffice enough for the individual in custody to
13  ambulate, then the medical partner would notify the
14  Sheriff by way of medical alert, that the individual
15  in custody was in need of more stringent or advanced
16  medical care.
17   Q   And I'm not talking about medical care,
18  Director, I'm talking about having a bar in the
19  shower --
20   A   But I'm saying that they're one in the same.
21  That we work with the medical partners to determine
22  how ambulatory the population is.  What is their
23  medical need, and access to the grab bar or having
24  access to a shower chair or having access to the
```

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 43

```
 1  grab bar is part and parcel to the medical
 2  evaluation and subsequent determination by our
 3  medical partner.
 4   Q   And so if a person, like Mr. Rogers, has a
 5  long distance only walker, does the Sheriff's
 6  office consider him ambulatory and not needing a
 7  grab bar --
 8   MR. DEVORE:  Objection, calls --
 9   MR. MORRISSEY:  Q  -- in the shower?
10   MR. DEVORE:  Objection, calls for a medical
11  opinion.
12   THE WITNESS:  Yes.
13   MR. MORRISSEY:  Q  Why?
14   A   Because his alert does not call for the
15  medical device to be on his person or her person, so
16  we make the determination for housing based on the
17  alert that we are presented with from our medical
18  partner.  So that's why we make, that's why the
19  distinction between the general cane, crutch, and
20  walker alert versus our medical partner telling us
21  that they only need these medical devices for long
22  distance travel.
23   Q   And is the same true if somebody has a long
24  distance only alert for a walker relating to a chair
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 11

LARRY GAVIN
December 19, 2024

Page 44

1  to sit down in the shower, that the Sheriff's office
2  doesn't consider that person of needing that type of
3  accommodation in the shower?
4  　　　A　　The long distance alert notifies the Sheriff
5  that the individual in custody only needs the
6  medical device when he or she is traveling long
7  distances.
8  　　　Q　　And I am talking about sitting down in the
9  shower, Director?
10 　　　A　　I understand.  I am not drawing the
11 correlation, because the medical alert is the driver
12 of the assessment and the need for the individual in
13 custody against the security need of the safety of
14 the, and security of the institution.
15 　　　Q　　So if a person has a general alert to use a
16 cane, crutch, or walker at all times, the Sheriff
17 considers that person needing a grab bar in the
18 shower?
19 　　　A　　We consider that person to have an, to be in
20 need of an elevated or an advance medical care, and
21 he would be, he or she would be housed in our
22 residential treatment unit or our Cermak building,
23 which has those devices attached and available.
24 　　　Q　　So, going back to Mr. Rogers, does the

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 45

1  Sheriff make any determination whether or not he has
2  a limitation getting him around?
3  　　　A　　The Sheriff does not.
4  　　　Q　　And so based on the Sheriff collaborating
5  with their partner, the medical staff, is the
6  Sheriff's office told that Mr. Rogers is not limited
7  in moving from place to place because he only has a
8  long distance walker alert?
9  　　　A　　The long distance medical device alert
10 notifies the Sheriff that the individual in custody
11 is only in need of his medical device if he or she
12 is traveling long distances.
13 　　　Q　　And has Cermak, from May of 2022 to the
14 present, ever told the Sheriff's office what it
15 means to have a long distance only walker?  Meaning
16 the limitation of the person's ability to stand or
17 squat or get up from the toilet?
18 　　　MR. DEVORE:  Objection, calls for speculation.
19 　　　THE WITNESS:  As you previously asked and I have
20 answered, we are not always privy to diagnoses and
21 particulars of an individual's need for a medical
22 device.  So we utilize the medical alerts from our
23 partners, and we make decisions on housing relative
24 to that medical need, in conjunction with the safety

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 46

1  and security of the population.
2  　　　MR. MORRISSEY:  Q  Now, if we go to another,
3  another grievance by Mr. Rogers, page 3 of that
4  Exhibit 9, it's a grievance by Mr. Rogers, it's
5  dated May 27, 2023, number 2022X08394, do you see
6  that, Director?
7  　　　A　　Yes.
8  　　　Q　　And you see it's a grievance about showering
9  and Mr. Rogers claims Division 9 is not accessible.
10 He needs a shower chair or something with rails?
11 　　　A　　Yes.
12 　　　Q　　And the response by Miss Rivero-Canchola is
13 on the next page, page 4.  And you see the response
14 saying Detainee Rogers is being housed according to
15 the medical classification assigned to him by
16 Cermak.  He is independent in his ADLs, including
17 showers, and should not require an accommodation.
18 If you feel this is incorrect, please fill out a
19 health service request form to speak with a doctor
20 about your concerns?
21 　　　A　　Yes.
22 　　　Q　　How does the Sheriff's office know that
23 somebody in Division 9, whether or not the person is
24 independent in his ADLs?

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 47

1  　　　A　　As previously asked, we utilize the medical
2  alerts that we're given from our medical partner, to
3  make decisions relative to housing, in conjunction
4  with the safety and security of the population.
5  　　　Q　　So relating to a person like Mr. Walker --
6  or Mister -- I'll rephrase the question.
7  　　　Relating to a person like Mr. Rogers, what
8  type of alert would indicate to the Sheriff's office
9  that he's independent with his ADLs?
10 　　　A　　The alert that says that the medical device
11 is needed for long distances.
12 　　　Q　　Who, from Cermak, or the County, told the
13 Sheriff's office that?
14 　　　MR. DEVORE:  Objection, calls for speculation.
15 　　　THE WITNESS:  Who told the Sheriff's office that
16 he needed a medical device for long distances?
17 　　　MR. MORRISSEY:  Q  No, that if you have a long
18 distance only alert, you're independent of ADLs?
19 　　　A　　Oh, I don't, I don't know, I can't speak to
20 Sabrina's response here, because I have not talked
21 to her specifically about anything relative to this
22 depo.  So I don't know if she spoke with someone at
23 Cermak, which is, which is customary, given that we,
24 that she's answering the grievance, but I can't say,

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 12

LARRY GAVIN
December 19, 2024

Page 48

1  on the record, that that's how she found out, I
2  don't know.
3      Q   Is there any general type of communication
4  the Sheriff's office received from the Cermak people
5  that a person in Division 9 with a cane, crutch, or
6  walker long distance alert is independent with ADLs?
7      A   Sabrina is our ADA compliance officer, so to
8  the extent that she would be collaborating with
9  Cermak on specifics relative to the population and
10 the ambulatory needs that coincide with that, then
11 that is absolutely possible.
12     Q   I'm going to show you, Director, Exhibit 13,
13 which is a video from Division 9 camera 1.04
14 underscore 1E, day room door, it's dated June 6th,
15 June 9th, 2024, do you see that?
16     A   Yes.
17     Q   And, Director, have you seen this video
18 before?
19     A   No.
20     Q   Do you know Mr. Rogers, Director?
21     A   No.
22     Q   Ever seen Mr. Rogers?
23     A   I don't know.
24     Q   Do you have any independent knowledge of

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 49

1  Mr. Rogers, his medical condition, his mobility
2  limitation?
3      A   No.
4      Q   I'm going to play it at 9:20.
5          (Whereupon the video was played.)
6      Q   I stopped it at 9:20:46.  Director, did you
7  see, during that video, this individual walk down a
8  few stairs?
9      A   Yes.
10     Q   And you mentioned earlier that one
11 accommodation for an individual to shower in
12 Division 9 is use of the railing?
13     A   No, I didn't say that.  We were talking
14 about someone's ability to go up and down the
15 stairs.  We didn't say anything about a railing with
16 a shower, it's not true.
17     Q   The stairs, the stairs have a railing.
18     A   Yes, but you, now you just said the shower,
19 we were talking about the stairs earlier.
20     Q   And one accommodation the Sheriff provides
21 for somebody with a long distance alert to go down
22 the stairs to get to the day room toilet or the
23 showers, is use of the railing?
24     A   The railings, correct.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 50

1      Q   And in this video, do you see the individual
2  shackled and handcuffed?
3      A   Yes.
4      Q   And it's common for individuals on tier 1E
5  to be handcuffed and shackled outside the cell,
6  correct?
7      MR. DEVORE:  Objection, form, calls for
8  speculation, incomplete hypothetical as to what
9  common is.
10     THE WITNESS:  Yes.
11     MR. MORRISSEY:  Q   Why is it common?
12     A   That is one of our restrictive units for
13 individuals who have violated rules of the
14 organization.
15     Q   Why would somebody with a long distance only
16 walker alert be on the second, have to go upstairs
17 to reach his cell.
18     MR. DEVORE:  Objection, form.
19     THE WITNESS:  Because he does not have any alert
20 that is active in our Jail Management System that
21 says that he cannot walk up stairs, or that he is in
22 need of his medical device on a permanent basis,
23 which would elevate his medical need for medical
24 housing.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 51

1      MR. MORRISSEY:  Q   Is there such an alert that
2  says an individual should not have to use stairs?
3      A   No, but if he had the general cane alert, he
4  would not be housed in Division 9, because it's
5  understood that that general alert means that the
6  individual needs to be in possession of his or her
7  medical device at all times.
8      MR. MORRISSEY:  I'll continue the video at
9  9:20:46.
10         (Whereupon the video was played.)
11     MR. MORRISSEY:  Q   I'll stop it at 9:21:57.  Did
12 you see this individual sit on the stairs?
13     A   Yes.
14     Q   Based on looking at this video footage, did
15 it look like this individual had any difficulty
16 descending the stairs?
17     MR. DEVORE:  Objection, calls for speculation.
18     THE WITNESS:  I can't say.
19     MR. MORRISSEY:  Q   Why not?
20     A   Because I don't know what is in the mind of
21 the individual in custody.  I don't know what's
22 being said to him.  I'm just looking at a video
23 where he's walking down the stairs slowly, and he
24 sat down.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 13

LARRY GAVIN
December 19, 2024

Page 52

1  Q   So it looks, does it appear this person has
2  any, any limitations on his ADLs, based on looking
3  at this video?
4      MR. DEVORE:  Objection, calls for speculation.
5      THE WITNESS:  Yeah, I don't even know what ADLs
6  mean, so I can't answer that.
7      MR. MORRISSEY:  Q  Now, Division 9 is maximum
8  security, correct?
9      A   Correct.
10     Q   And it houses the most violent people at the
11 Cook County Jail?
12     A   I don't know how we define violent, it's a
13 maximum security, one of our maximum security
14 buildings.
15     Q   Is the fact that it's one of the maximum
16 security buildings a reason why there are no grab
17 bars to help somebody shower?
18     MR. DEVORE:  Objection, form.
19     THE WITNESS:  No.
20     MR. MORRISSEY:  Q  Why not?
21     A   We house maximum security individuals in
22 custody in the RTU, and there are grab bars there,
23 and they're maximum security, so the level of
24 security has nothing to do with what devices are in

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 53

1  the building.
2      Q   So the fact that Division 9 is maximum
3  security doesn't have any impact on the fact it
4  doesn't have any grab bars in the showers or by the
5  cell toilets?
6      A   No.
7      Q   That's correct?
8      A   Yes.
9      Q   And the Sheriff's office assigns maximum
10 security detainees who use canes, crutches, and
11 walkers at all times to places that have grab bars
12 in the shower?
13     A   Yes.
14     Q   And the Sheriff's office allows people with
15 maximum, maximum security individuals in other
16 divisions at the jail to use their device on the
17 tier?
18     MR. DEVORE:  Objection, form.
19     THE WITNESS:  RTU and Cermak, as previously
20 asked and answered.
21     MR. MORRISSEY:  Q  So the security
22 classification in Division 9 has no impact on the
23 restriction of using the cane, crutch, or walker
24 within the housing unit; is that fair to say?

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 54

1      A   The security classification in Division 9,
2  as previously asked and answered, in Division 9, we
3  do not allow individuals in custody to have medical
4  devices on the living units for the safety and
5  security of the population and the staff.
6      Q   But there are similar levels of security in
7  the compound where the devices are permitted?
8      MR. DEVORE:  Objection, form.
9      A   Yes.
10     MR. MORRISSEY:  Q  And for somebody in Division
11 9, if the medical staff said that the person needs
12 the device at all times, the Sheriff office would
13 put them into a different division?
14     A   Yes.
15     Q   And there's never an issue with capacity for
16 moving people who need a device at all times to
17 other parts of the jail?
18     MR. DEVORE:  Object as to form, as to never.
19     THE WITNESS:  Yeah, I can't say never, but,
20 again, as previously asked and answered, as our
21 standard practice, we will not house someone in
22 Division 9 who has an alert that says they need to
23 have possession of a cane, crutch, or walker at all
24 times.

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 55

1      Q   And why not?
2      A   Because we don't house individuals in
3  custody in Division 9 who need to have their medical
4  device on their person at all times, as you
5  previously asked, and I'll answer again, for the
6  safety and the security of our staff and the
7  population.
8      MR. MORRISSEY:  Q  Is that because there are no
9  grab bars by the toilets and the shower also?
10     MR. DEVORE:  Objection, asked and answered.
11     THE WITNESS:  No.
12     MR. DEVORE:  Several times.
13     MR. MORRISSEY:  I'll continue playing Exhibit 13
14 at 9:21:57.
15     MR. MORRISSEY:  I'll stop it at 9:24.
16     Q   Do you see in that frame, there's an
17 individual, Mr. Rogers, still sitting on the stairs?
18     A   Yes.
19     Q   If correctional staff in Division 9 are
20 aware, between May of 2022 and the present, that
21 somebody has a mobility limitation and may face
22 difficulty toileting and showering, is there a
23 requirement for the Sheriff's office to help
24 facilitate an accommodation?

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 14

LARRY GAVIN
December 19, 2024

Page 56

1   A   The Sheriff is responsible for availing
2   medical and mental health services to individuals in
3   custody, based on the examination of that individual
4   in custody, he or she will be housed according to
5   the medical need, in addition, in collaboration with
6   their level of security acuity.
7       Q   In May of 2022 to the present, as the
8   Sheriff's representative, has the Sheriff's office
9   asked Cermak the level of accommodation needed for a
10  person with a long distance walker needs to shower
11  and toilet.
12      MR. DEVORE: Objection, speculation.
13      THE WITNESS: I am not privy to every single
14  interaction or communication that the office has
15  with our medical partner, but to say that if there
16  was a need for advanced medical and/or a mental
17  health need, that we were work collaboratively with
18  our partners and make the best housing decision
19  possible, based on their recommendation and our
20  overview of security and safety of the staff and the
21  individuals in custody.
22      Q   Are you talking about specific
23  circumstances?
24      A   Yes.

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 57

1       Q   I'm talking about general?
2       A   Same in general as well. Every situation is
3   nuanced, but as a general practice, we also
4   collaborate with our medical and mental health
5   partners to make the best decision that we can,
6   based on housing, along with the security acuity,
7   that's in general and specific to the individuals in
8   custody and their needs.
9       Q   In general, about toileting, is there any
10  collaboration about what accommodation a person with
11  a long distance alert needs for toileting or
12  showering?
13      MR. DEVORE: Objection, asked and answered.
14      THE WITNESS: You asked and answered, I'm going
15  to answer the same way. That we work
16  collaboratively with our mental health, and medical
17  and mental health partners, based on the medical
18  recommendation, and we house the population based on
19  their medical recommendation in conjunction with
20  their security acuity for the safety of the
21  population and our staff.
22      Q   From May of 2022 to the present, has the
23  Sheriff's office told their partners that Division 9
24  is not accessible for showers and toilets?

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 58

1       MR. DEVORE: Objection, asked and answered, I
2   don't know how many times. Many.
3       THE WITNESS: That the showers are not
4   accessible, I'm not sure I understand.
5       MR. MORRISSEY: Q   Well, you know the showers
6   don't have grab bars, right?
7       A   Yes.
8       Q   And you know the toilets don't have grab
9   bars?
10      A   Yes.
11      Q   And you know there's no seats in the showers
12  for inmates in Division 9?
13      A   Cermak does as well.
14      Q   How, what evidence do you have that Cermak
15  knows that there were no grab bars in the showers
16  and toilets and there's no seats for people --
17      A   Because they have a 24 hour medical
18  dispensary in that building and they pass the
19  medications on the living units.
20      Q   And those are the line nurses and the
21  physician assistant that works in the building?
22      A   That's correct.
23      MR. DEVORE: Objection to form.
24      THE WITNESS: I'm sorry. That's correct.

TOOMEY REPORTING
312-853-0648

LARRY GAVIN
December 19, 2024

Page 59

1       MR. MORRISSEY: Q   Does the leadership at Cermak
2   know about that?
3       MR. DEVORE: Objection, calls for speculation.
4       THE WITNESS: I would presume that the
5   leadership is the one that assigns the staff to that
6   building.
7       MR. MORRISSEY: Q   So as the Sheriff's
8   representative, it's your belief that Cermak
9   leadership knows that the showers and the toilets do
10  not have grab bars?
11      MR. DEVORE: Objection, form. Calls for
12  speculation. Outside the scope of the notice.
13      THE WITNESS: Yeah, I don't know what they know.
14  I know that they have their staff in that building
15  to facilitate medical processes in that building.
16      MR. MORRISSEY: Q   Do you know Dr. DeFuniak?
17      A   I do.
18      Q   And is it your understanding he knows about
19  the inaccessible toilets and showers in Division 9?
20      MR. DEVORE: Objection, form, calls for
21  speculation.
22      THE WITNESS: Yeah, I don't know what
23  Dr. DeFuniak knows or doesn't know.
24      MR. MORRISSEY: Q   From May of 2022 to now, has

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 15

LARRY GAVIN
December 19, 2024

Page 60

1 the medical staff given training to the Sheriff's
2 office about what it means for a person with a long
3 distance walker, the toilet or shower?
4     MR. DEVORE:  Objection, calls for speculation.
5     THE WITNESS:  No.
6     MR. MORRISSEY:  Q  What about for somebody with
7 a long distance cane or crutch alert, from May of
8 2022 to now, has the County medical staff given any
9 training about what type of an accommodation those
10 people need showering and toileting?
11     A  No.
12     Q  Outside of what your partners at Cermak
13 convey in the Jail Management System, does the
14 Sheriff's office, from May of 2022 to now, conduct
15 any assessment, whether or not some individual in
16 Division 9 needs grab bars by the toilet or shower,
17 who has a long distance only alert?
18     A  **The Sheriff does not assess an individual in**
19 **custody's medical need.**
20     Q  And is that true about whether the person
21 needs grab bars in the toilet?
22     A  **Yes.**
23     Q  Is that true about whether grab bars are
24 needed by that individual to shower?

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 61

1     A  **That's true for determining how ambulatory**
2 **an individual in custody is and what they can**
3 **physically do and not do.**
4     Q  The Sheriff office, from May of 2022 to the
5 present, doesn't conduct any assessment or analysis
6 about an individual's mobility to use a toilet with
7 or without grab bars?
8     MR. DEVORE:  Objection, he just answered that.
9     THE WITNESS:  Yeah, we do not, we do not.  We
10 take our recommendation from our medical partners
11 about an individual in custody's level of
12 ambulatoriness.
13     MR. MORRISSEY:  Q  And for a person, like
14 Mr. Rogers, in this video, in May of 2022 to now, is
15 it fair to say the Sheriff's office wouldn't label,
16 put a label on whether or not he has a limitation
17 ambulating?
18     A  **I don't, I don't know what his limitation**
19 **is, because I'm not privy to his diagnosis.**
20     Q  Is that true for everybody within Division
21 9?
22     A  **That is, yes.**
23     Q  So the Sheriff's office makes no assessment
24 whether somebody has a limitation bending or

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 62

1 squatting or standing?
2     MR. DEVORE:  Objection, asked and answered.
3     THE WITNESS:  We assess by way of the medical
4 alert from the medical examination that the
5 individual in custody had with our medical partner.
6     MR. THOMAS MORRISSEY:  Wait, can we have a few
7 moment, Pat.
8     MR. MORRISSEY:  One moment.
9         (Whereupon a break was taken at 4:00.)
10         (Back on the record at 4:12.)
11     MR. MORRISSEY:  Q  Showing you Exhibit 14, a
12 declaration of Mr. Rogers.  Can you look at the
13 second page.  Do you see the picture?
14     A  **Uh-huh.**
15     Q  Is that a yes?
16     A  **Yes.**
17     Q  Does that appear to be an interlock in
18 Division 9.
19     A  **Yes.**
20     Q  And you see there's three canes that are
21 hanging on the railing, a walker, and some crutches?
22     A  **Yes.**
23     Q  And based on your understanding, is that the
24 location where canes, crutches, and walkers are

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 63

1 stored generally in Division 9?
2     A  **Yes.  If individuals in custody have the**
3 **corresponding alert, that's where we store them**
4 **until we give it back to them for their movement.**
5     Q  And so if a person with a cane, crutch, or
6 walker leaves the housing unit, the officer would
7 provide the device to the individual, if they're
8 moving around outside the living unit?
9     A  **Yes.**
10     Q  And what would the inmate have to do to get
11 the device?
12     A  **Just ask them for their medical device.**
13     Q  And the officer would provide it?
14     A  **Yes.**
15     Q  And so once the individual leaves the living
16 unit and, let's say, goes down to the dispensary to
17 see the doctor, would he be allowed to use the long
18 distance device?
19     A  **Yes.**
20     Q  And what about going over to the barber
21 shop?
22     A  **Yes.**
23     Q  And chapel?
24     A  **Yes.**

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 16

LARRY GAVIN
December 19, 2024

Page 64

1  Q   He's going to walk over to Cermak?
2  A   Yes.
3  Q   So, any movement outside the tier, the
4  officer, if the person had a long distance alert,
5  would give the device?
6  A   Yes.
7  Q   And when that person comes back to the tier,
8  what would the normal practice be by the officer to
9  collect the device?
10 **A   To retrieve the device prior to letting the**
11 **individual in custody back on the living unit.**
12 Q   And the practice and the procedure in
13 Division 9, from May of 2022 to now, is if the
14 individual is locked inside the living unit, he may
15 not use the cane, crutch, or walker?
16 **A   That is correct.**
17 Q   And if the inmate was in his cell, he
18 couldn't have the cane, crutch, or walker?
19     MR. DEVORE:  Objection, as to form, and just to
20 make it clear, we're talking about long distance
21 alerts, or are we talking, just to be, it was
22 unclear to me.
23     MR. MORRISSEY:  Q  Well, if it's long distance,
24 the officer would give it right when the individual

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 65

1  leaves the living unit, right, to go walk in the
2  division?
3  A   Yes.
4  Q   And the same would be true if there's a
5  general alert, and the guys in the living unit in
6  Division 9, once that individual leaves the living
7  unit, the officer would give the general cane,
8  crutch, or walker to the inmate?
9  A   Yes.
10 Q   And is it true the same procedure is
11 followed, whether it's long distance or general, if
12 somebody has a cane, crutch, or walker, and comes
13 back to the living unit, the officer collects the
14 device?
15 A   Yes.
16 Q   And whether it's long distance or general,
17 inside the living unit, an individual is not allowed
18 to have the cane, crutch, or walker?
19 A   Yes.
20 Q   And they're not allowed to have the device,
21 whether it's long distance or general, inside the
22 cell?
23 A   Yes.
24     MR. MORRISSEY:  I have nothing further.  Thanks

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 66

1  for your time, Director.
2     MR. DEVORE:  Counsel, just to make it clear, you
3  were talking about Division, these were all related
4  to Division 9, correct?
5     MR. MORRISSEY:  Right.
6     MR. DEVORE:  Okay.
7     MR. MORRISSEY:  Isn't that what I said?
8     MR. DEVORE:  I think so.
9     MR. MORRISSEY:  I just want to make clear, since
10 the break, all the questions were about Division 9.
11 Counsel, I mean I don't, I think I said Division 9.
12    MR. DEVORE:  Okay.
13    MR. MORRISSEY:  I could have misspoke, but.
14    MR. DEVORE:  Yeah, I was just making sure.  I
15 think we're good.
16    MR. REPORTER:  Signature?
17    MR. DEVORE:  Reserved.
18    MR. MORRISSEY:  We'll take it, Dennis.
19    MR. REPORTER:  Okay.  Counsel, do you need a
20 copy?
21    MR. DEVORE:  Yes, please.
22    MR. REPORTER:  All right.  Thanks, everyone.
23    - - - - - - - - - - - - - - - - - - - - - - - -
24

TOOMEY REPORTING
312-853-0648

---

LARRY GAVIN
December 19, 2024

Page 67

1  STATE OF ILLINOIS  )
                      )  ss:
2  COUNTY OF C O O K  )
3
4       The within and foregoing deposition of the
5  aforementioned witness was taken before DENNIS M.
6  HARTNETT, CSR, at the place, date and time
7  aforementioned.
8       There were present during the taking of the
9  deposition the previously named counsel.
10      The said witness was first duly sworn and
11 was then examined upon oral interrogatories; the
12 questions and answers were taken down in shorthand
13 by the undersigned, acting as stenographer, and the
14 within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the
17 time and place hereinabove referred to.
18      The signature of the witness was not
19 waived, and the deposition was submitted, pursuant
20 to Rules 30 (e) and 32 (d) of the Rules of Civil
21 Procedure for the United States District Court, to
22 the deponent per copy of the attached letter.
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 17

LARRY GAVIN
December 19, 2024

Page 68

1  The undersigned is not interested in the
2 within case, nor of kin or counsel to any of the
3 parties.
4
5
6  Witness my official signature in and for
7 Cook County, Illinois on this 23rd day of December
8 A.D. 2024.
9
10
11
12
13  _____
14 DENNIS HARTNETT
   TOOMEY REPORTING
15 200 S. Wacker Drive - 3100
   Chicago, Illinois  60606
16 Phone:  (312) 853-0648
17
18
19
20
21
22
23
24