Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                     EASTERN DIVISION
 4   _____
 5   CUAUHTEMOC HERNANDEZ,
 6          Plaintiff,
 7       v.                                    Case No.
 8   THOMAS DART, SHERIFF OF COOK              22-cv-16970
 9   COUNTY, AND COOK COUNTY,
10   ILLINOIS,
11          Defendants.
12   _____
13                VIDEOTAPED DEPOSITION OF
14                    KAVARIAN ROGERS
15   DATE:         Thursday, September 19, 2024
16   TIME:         9:34 a.m.
17   LOCATION:     Remote Proceeding
18                 Cook County Department of Corrections
19                 2700 South California Avenue
20                 Chicago, IL 60608
21   REPORTED BY:  Carly Hemberger
22   JOB NO.:      6902808
23
24
```

Page 2

1    A P P E A R A N C E S
2  ON BEHALF OF DEFENDANTS THOMAS DART, SHERIFF OF COOK
3  COUNTY, AND COOK COUNTY, ILLINOIS:
4      ZACHARY STILLMAN, ESQUIRE (by videoconference)
5      DeVore Radunsky LLC
6      230 West Monroe Street, Suite 230
7      Chicago, IL 60606
8      zstillman@devoreradunsky.com
9      (312) 300-4479
10
11  ON BEHALF OF KAVARIAN ROGERS:
12      PATRICK W. MORRISSEY, ESQUIRE (by
13      videoconference)
14      Thomas G. Morrissey LTD
15      10257 South Western Avenue
16      Chicago, IL 60643
17      pwm@morrisseylawchicago.com
18      (773) 233-7900
19
20  ALSO PRESENT:
21      Robert "Bob" Gore, Veritext Videographer (by
22      videoconference)
23      Erin Wright, DeVore Radunsky Law Clerk (by
24      videoconference)

Page 3

1            I N D E X
2  EXAMINATION:                    PAGE
3      By Mr. Stillman              7
4      By Mr. Morrissey             57
5
6          E X H I B I T S
7  NO.      DESCRIPTION              PAGE
8  Exhibit 1   Grievance 202113934     40
9  Exhibit 2   Grievance 2023X18872    45
10 Exhibit 3   Declaration of Kavarian Rogers  49
11 Exhibit 4   Incident Report Dated 10/12/21  55

Page 4

1            P R O C E E D I N G S
2       THE REPORTER: Good morning. My name
3  is Carly Hemberger; I'm the reporter assigned by
4  Veritext to take record of this proceeding. We are
5  now on the record at 9:34 a.m.
6       This is the deposition of Kavarian
7  Rogers taken in the matter of Cuauhtemoc Hernandez vs.
8  Thomas Dart, Sheriff of Cook County, and Cook County,
9  Illinois on Thursday, September 19, 2024, at Cook
10 County Department of Corrections, 2700 South
11 California Avenue, Chicago, Illinois 60608.
12       I am a notary authorized to take
13 acknowledgments and administer oaths in Illinois.
14 Parties agree that I will swear in the witness
15 remotely.
16       Additionally, absent an objection on
17 the record before the witness is sworn, all parties
18 and the witness understand and agree that any
19 certified transcript produced from the recording of
20 this proceeding:
21       - is intended for all uses permitted
22          under applicable procedural and
23          evidentiary rules and laws in the
24          same manner as a deposition recorded

Page 5

1          by stenographic means; and
2       - shall constitute written stipulation
3          of such.
4       This proceeding will be recorded via
5  video technology by Robert Gore.
6       At this time will everyone in
7  attendance please identify yourself for the record.
8       MR. MORRISSEY: Sure. My name is Pat
9  Morrissey. I represent Mr. Rogers. I'm in person
10 with Mr. Rogers, and I agreed to the remote
11 deposition. I'm a little off screen because we're in
12 a room that doesn't have any space for me to be closer
13 to him.
14       Proceed.
15       THE REPORTER: Mr. Stillman?
16       MR. STILLMAN: Yeah. Sorry, my thing,
17 like, froze for a minute. I missed where we are right
18 now. I lost like a minute there. Not even a minute,
19 like 20 seconds there.
20       THE REPORTER: We are introducing
21 ourselves.
22       MR. STILLMAN: Okay. Yeah, Zachary
23 Stillman for Sheriff Dart and Cook County.
24       THE REPORTER: Okay. Thank you.

2 (Pages 2 - 5)

Page 6

1 Hearing no objection, I will now swear in the witness.
2     Please raise your right hand.
3 Mr. Rogers?
4         MR. MORRISSEY: I don't know if he can
5 raise --
6         MR. ROGERS: Yeah, I can't -- my right
7 hand, like, that's my disabled side, so -- it can go,
8 like, this much though.
9         THE REPORTER: Okay.
10 WHEREUPON,
11         KAVARIAN ROGERS,
12 called as a witness and having been first duly sworn
13 to tell the truth, the whole truth, and nothing but
14 the truth, was examined and testified as follows:
15         THE REPORTER: Proceed.
16         MR. STILLMAN: All right. Good
17 morning, Mr. Rogers.
18         MR. MORRISSEY: You can put your hand
19 down, Mr. Rogers.
20         THE WITNESS: Good morning, sir.
21         MR. STILLMAN: What was that, Pat?
22         MR. MORRISSEY: I told him he could put
23 his hand down; he continued to keep holding it.
24         MR. STILLMAN: Oh, okay, yeah.

Page 7

1     All right. So this is the deposition
2 of Kavarian Rogers taken pursuant to notice.
3         EXAMINATION
4 BY MR. STILLMAN:
5     Q   Could you please state your full name and
6 spell it for the record?
7     A   My name is Kavarian Rogers, K-A-V-A-R-I-A-N
8 R-O-G-E-R-S.
9     Q   Good morning, Mr. Rogers. My name is
10 Zachary Stillman, and I represent the defendants in
11 this case. Have you ever given a deposition before?
12    A   -- sir.
13    Q   Was that a no?
14    A   No, sir.
15    Q   Okay. Today I'm going to be asking you a
16 series of questions. And just to make things easier,
17 we're going to go over a couple of ground rules before
18 we get started.
19     First, we have a court reporter here today,
20 so to make life easier for her, I'd ask that you try
21 to keep the record as clean as possible by not
22 speaking over me, and I'll do the same for you. If I
23 ask a question, I'll wait until you finish answering
24 to ask another one, and I'll try not to interrupt any

Page 8

1 of your answers before asking the next question.
2     Second, please answer all questions
3 verbally, and refrain from gesturing or pointing at
4 things, because that will be unclear on the record.
5 Is that all okay?
6    A   Yes, sir.
7    Q   And then if you don't understand any of my
8 questions, please let me know, and I can try to
9 rephrase or ask the question differently. If you do
10 answer, I'm going to assume that you understood the
11 question.
12     And if there's something that you don't
13 recall, don't guess; just saying that you don't -- you
14 don't recall is a valid answer. And then finally, if
15 you need to take a break at any point today, that's
16 totally fine. And I would ask that just if there's a
17 question pending, we finish that one, and then we get
18 off the record and take a break. Is that all clear to
19 you?
20    A   Yes, sir.
21    Q   Okay. Do you go by any other names in the
22 jail?
23    A   Lil Val.
24    Q   What was that? Lil Val?

Page 9

1    A   Yeah.
2    Q   Anything else?
3    A   Kavarian -- they'll call me Kavari.
4    Q   And what is your date of birth?
5    A   March 9, 1998.
6    Q   And are you married, or have you ever been
7 married?
8    A   [No audible response.]
9    Q   What was that?
10   A   No, sir.
11   Q   Okay. Thank you.
12         MR. STILLMAN: And then off the record
13 momentarily.
14         THE REPORTER: Okay. We are now off
15 the record at 9:40.
16         (Off the record.)
17         THE REPORTER: We are back on the
18 record at 9:40 a.m.
19 BY MR. STILLMAN:
20   Q   Did you meet with anyone before this
21 deposition today?
22   A   Excuse me?
23   Q   Pardon?
24   A   Excuse me?

Page 10

1  Q  Do you need me to re-ask the question?
2  A  Yes, sir.
3  Q  Okay. Did you meet with anyone before the
4  deposition today?
5  A  [Unintelligible response.]
6  Q  Was that a yes or no?
7  A  Yes, sir.
8  Q  And who did you meet with?
9  A  My attorney.
10  Q  And would that be Pat, who's in the room
11  with you?
12  A  Yes, sir.
13  Q  Where did you meet with him, or how?
14  A  I meet with him in the jail.
15  Q  Did you talk to him over the phone, or was
16  he there in person?
17  A  He was here in person.
18  Q  And when did that take place?
19  A  Probably about 9 -- 9 o'clock.
20  Q  That was today, before?
21  A  Yes, like, about --
22  Q  Sorry. Did you ever talk to him before
23  that?
24  A  Yes, sir. I talked to him multiple times

Page 11

1  over the phone, previous times, and in the jail. Over
2  in Division 9, over there.
3  Q  And did you review any documents with him?
4  A  Yes, sir.
5  Q  This morning, I mean. What did you review
6  with him?
7  A  We just reviewed, like, me going up and
8  down, like, stuff that was difficult for me. Like, my
9  papers and everything that I -- that I, like, went
10  through prior to me being in here.
11  Q  So your papers, you mean, like --
12  A  Like traveling, where I been traveling to,
13  places like that, where I been held at, things like
14  that. I'm sorry.
15  Q  Okay. So like your transportation and,
16  like, housing, or alerts, your -- did you look at
17  grievances?
18  A  We -- we previously looked at grievance, but
19  we didn't have a chance to look at grievances today.
20  Q  Okay. Did you look at, like, your
21  declaration in this case?
22  A  Yes, sir.
23  Q  Okay. Have you ever reviewed any Cook
24  County Jail policies and procedures?

Page 12

1  A  Yes, sir.
2  Q  Could I ask, when you answer, can you speak
3  up a little bit? Because I'm having trouble hearing
4  your first answer.
5  A  Oh, sorry. Yes, sir. Yes, sir. Can you
6  hear me now?
7  Q  Yeah, thank you. Do you know what the ADA
8  is?
9     You don't have to lean in so much; I know
10  it's probably not the most comfortable for you.
11     But yeah, do you know what the ADA is?
12  A  Yes -- yes, sir, I know what the ADA is.
13  Q  And what is the ADA?
14  A  It's the American with Disability Act.
15  Q  And could you tell me in your words what
16  that is?
17  A  Like -- like, in my words, I just feel like
18  it's -- prior to me, myself, and what I go through,
19  you know, probably, like, people with disabilities.
20  Like, I got a brain injury; that's part of my
21  disability. So what was wrong with me, I have a
22  traumatic brain injury. That was my diagnosis. I was
23  shot in my head in 2020 of February 9th, and it left
24  me with my right side disabled, like, from -- from my

Page 13

1  head to my toe, everything over there is, like -- it's
2  limited, so --
3  Q  Okay. And have you ever reviewed any kind
4  of ADA standards?
5  A  Can you break it down to me what it is?
6  Q  Yeah, have you ever reviewed any kind of,
7  like, construction standards or guidelines under the
8  ADA?
9  A  Oh, yes, sir. Like, things that comply to
10  the ADA?
11  Q  Yeah, like, what about that have you
12  reviewed?
13  A  Yeah, I -- I reviewed the -- the part where,
14  like -- where -- where you supposed to be treated
15  properly, and where you supposed to be housed properly
16  and things like that. That's what you mean?
17  Q  No. So under the ADA, you know, there are,
18  like, guidelines and standards on, like, you know, how
19  you construct things, you know, the types of angles of
20  ramps maybe, or, like, standards for having different
21  types of accessibility features for --
22  A  Oh, yes, sir. Yes -- yes, I have. Yes, I
23  have.
24  Q  What kinds have you reviewed?

Page 14

1  A   I reviewed, like, the ramp part, and I
2  reviewed the tunnel as well, and, like, the showers
3  and things like that.
4     Q   And what do you know about ramps and tunnels
5  under the ADA?
6     A   Like -- like, the tunnels is something like
7  you have to travel to get place to place to.  And --
8  and doing so, I have been one of those ones that did
9  it, but it caused me tremendous pain.  'Cause I -- I
10 have a walker -- or I had a walker before I had a
11 seizure and my walker was took from me -- so I use my
12 walker to get from place to place.  But it's hard
13 going up the Cermak ramp, and it's challenging for me,
14 'cause, like, I have no -- like, once the tunnel right
15 there, it'll get difficult for me, and things like
16 that.
17    Q   So you've had issues on the ramps and on RTU
18 tunnel and the Cermak tunnel, correct?
19    A   Yes, sir.
20    Q   So that would be, like, the RTU ramp and the
21 Cermak ramp?
22    A   That's -- that's exactly what I mean, like,
23 the Cermak ramp and the RTU tunnel.  I'm sorry about
24 that.

Page 15

1     Q   No problem, I'm just clarifying.  But you've
2  had issues on those ramps, correct?
3     A   Yes, sir.
4     Q   What kind of issues have you had on those
5  ramps?
6     A   Like, I -- like, I had struggled with issues
7  like -- 'cause I be traveling, going through there for
8  court.  Then I'll be traveling, going there, like --
9  going to Cermak, and I -- one time I fell.  Things
10 like I fell, hurt myself.  I asked the guard to give
11 me some assistance, I don't know, like -- and then
12 most of the time, I just try to get it up myself,
13 since I can't get the adequate assistance that I need.
14 Can you hear me?
15    Q   And what do you know about the features of
16 those ramps, as far as, like, how they may or may not
17 comply with the ADA?
18    A   Like, it's difficult for me to get up them,
19 and, like -- like, I -- I could've sworn ADA is, like,
20 to make you at ease, you know, like, and that doesn't
21 fit for me, like -- 'cause I use a -- the -- I be
22 requesting a cart to get to where I be trying to get
23 to, but they deny it every time.
24    Q   Do you know any others in the jail or who

Page 16

1  have now gotten out who have used those tunnels and
2  the ramps and have had similar issues to you?
3     A   Yes, sir.
4     Q   Could you name them?
5     A   I'm not -- I'm not sure, like, if they'll be
6  wanting me to say they names on this, you know, so --
7     Q   But you know names that you have in your
8  head?
9     A   Yes, sir.
10    Q   Okay.  And you said you "fell;" when did you
11 fall on the ramp?
12    A   One of -- one of my diagnoses was amnesia,
13 so, like, I got short term memory loss, so I'm -- I
14 don't remember what time I fell.  But it was probably,
15 like, couple months back, maybe a year back.
16    Q   And have you ever filed or been involved in
17 any lawsuits before?
18    A   No, sir.
19    Q   Before this one, at least?
20    A   Before this one, no, sir.
21    Q   Are you involved in any other lawsuits
22 presently?
23    A   Yes, sir.
24    Q   And what is the other lawsuit you're

Page 17

1  involved in?
2     A   Like, I got -- I got, like -- like, 'cause I
3  was just held in Division 9.  I was not supposed to be
4  housed over there.  So I mean, maybe if you talking
5  about that.  That's the only -- that's the only other
6  lawsuit I could think of that -- that I'm in.  'Cause
7  I was sent to Division 9 for two and a half, almost
8  three years.  And that's the only other lawsuit I can
9  think of, like --
10        'Cause Division 9 was real difficult for me.
11 I ended up getting sent over there prior to incidents
12 that they saying was -- occurred, but they dropped my
13 status and took my walker -- I mean, took my
14 wheelchair, and sent me over there.  So I don't have
15 no, like, handicap assessment showers over there and
16 things like that.  So that's where that lawsuit came
17 from, like, from the hardship and everything that was
18 going on over there.  That what you mean, sir?
19    Q   Yeah, thank you.  You're doing great.  Do
20 you know the date that you were first admitted to Cook
21 County Jail?
22    A   April 1, 2020.
23    Q   Where were you housed when you first entered
24 the jail?

Page 18

1  A   I was housed in RTU.
2  Q   And where are you housed now?
3  A   I just made it back to RTU two months ago.
4  Q   Where else have you been at the jail?
5  A   I been in Division 9, in Division 5. Once
6  I -- once I came to Division -- once I made it to
7  Division 8. I was there for almost, like, two, three
8  months, and then they -- they sent me to Division 5 by
9  accident, because the CO told me I don't supposed to
10 be over there. And he -- and he looked at my status,
11 and he called a lieutenant, and they sent me back to
12 Division 8, 'cause I couldn't get up and down the
13 stairs.
14     They had me up and down the stairs in
15 Division 5 when I first came. And when I was over
16 there for about five months, they end up sending me
17 straight back to RTU, 'cause I couldn't come out my
18 cell and things, far as, like, to use the phone and
19 call my family.
20     So that's where I was at, Division 5,
21 Division 9, and Division 8. And Division 10 as well.
22 And Division 10 as well. I was housed in Division 10
23 for quite a long time as well, too, yeah.
24 Q   And are you in a wheelchair right now?

Page 19

1  A   Yes, sir.
2  Q   Do you currently have access to a wheelchair
3  at the jail, or were you just brought to over there in
4  the wheelchair?
5  A   This is my wheelchair now. It was provided
6  for me by Saint Anthony's because the -- Cook County
7  wouldn't give me one, and they kept taking my walker
8  and everything. So I went to Saint Anthony's when I
9  had my seizure. Recently I just had a seizure in
10 Division 9, an -- and I bust my head over here. And
11 from there, the nurse had sent me to the dispensary,
12 and dispensary sent me straight out to Saint Anthony's
13 hospital. I stayed at Saint Anthony's Hospital for
14 six days, and they cleared me to 3 North and RTU.
15 Q   And before you had that seizure, you were
16 using a walker at least for, like, long distance
17 travel, correct?
18 A   Yes, sir. I was using a walker for long
19 distance. But I'm just writing grievances and
20 everything, but they was telling me that it's
21 noncompliant with like -- 'cause I needed short
22 distance for my walker, but they saying I need long
23 distance.
24 Q   And throughout your time at Cook County

Page 20

1  Jail, have you only used a wheelchair and a walker, or
2  did you also have canes at times?
3  A   Yes, sir, I had a cane at times, times when
4  I was gaining more strength. But like, I have two
5  types of seizures; one of them is epileptic seizure,
6  and one of them is grand mal. So like, my epileptic
7  seizures, I would just lose memory and things like
8  that, and forget where I'm at. But my -- my grand mal
9  seizures are, like, it's -- it can be condition as,
10 like, so leave and go to Saint Anthony's, losing one
11 side again, which I just did from this seizure. My
12 side went back out, my right side went back out, and
13 they provide me a wheelchair.
14 Q   And when you entered the Cook County Jail
15 back on April 1, 2020, that was shortly after you had
16 been shot, correct?
17 A   Yes, sir.
18 Q   At that time, how far along in, like,
19 recovery were you?
20 A   Like, two months. 'Cause it happened
21 February 9th, so January, February, March --
22 Q   So were you walking at that time, or were
23 you, like, still being -- you're still in a wheelchair
24 then?

Page 21

1  A   Yeah, I -- no, I was using the wheelchair.
2  Then I -- I got the wheelchair took from me, they gave
3  me a cane, and I got the cane took from me and they
4  gave me a walker. So it was pretty much like here and
5  there things, but then they took it from me. I ain't
6  had nothing. I was just --
7  Q   And right now with the wheelchair, you're in
8  the RTU, correct?
9  A   Yes, sir.
10 Q   And you're able to use it for long and short
11 distance, so they never take it away from you?
12 A   No, sir. Long and short distance.
13 Q   And your memory issues related to your
14 traumatic brain injury, that started when you were
15 shot?
16 A   Yes, yes, it just started when I was shot.
17 Q   And prior to that seizure you had when you
18 got the wheelchair, you were using a walker?
19 A   Yes.
20 Q   But for long distance travel only?
21 A   Yes, yes, I was using the walker for long
22 distance only.
23 Q   Do you remember who would've prescribed or
24 assigned the walker to you at the jail?

Page 22

1  A  Jamie, her -- like, Jamie, like, physical
2  therapy Jamie.  She gave me a walker.
3     Q  And are you aware of any kind of policies,
4  procedures, or rules at the jail regarding whether,
5  like, an officer or someone should be assisting you
6  with, you know, either when you were in the walker,
7  assisting you with that, when you're moving from one
8  location to another, or now, in the wheelchair,
9  assisting you with that?
10    A  I wasn't aware of it back then, but I'm
11 aware of it now, because I read the handout book.
12 'Cause that's only how I got aware of it, 'cause I
13 read the handout book.
14    Q  And what are you aware of?
15    A  That I'm supposed to be getting adequate
16 medical attention, and -- and I can't remember the
17 other one.
18    Q  Well, I mean, in your words, does adequate
19 medical attention include assistance with your
20 wheelchair or walker?
21    A  Yes, sir, absolutely.
22    Q  Okay.  Are you usually treated medically by
23 officers at the Sheriff's office?
24       MR. MORRISSEY:  Objection to form.

Page 23

1  BY MR. STILLMAN:
2     Q  Are you usually treated medically by people
3  at Cermak, or by officers from the Sheriff's office?
4     A  I'm usually treated by medical.
5     Q  And do you know if people, like, you know,
6  like a white shirt, like a sheriff's officer
7  transporting you around the jail, do you know if they
8  have the same employer as someone treating you at
9  Cermak?
10    A  No, they don't.
11    Q  And which of those two groups of people
12 would be more likely to be, like, caring for your
13 adequate medical needs?
14    A  Medical meant ADA, far as me.
15    Q  Have you ever reviewed any kind of
16 architectural or engineering reports regarding any
17 kind of features at the jail?
18    A  What is that?  I'm not sure what that is.
19    Q  What'd you say?
20    A  I'm not for sure what that is.  I'm sorry.
21    Q  You know, like, have you ever reviewed any
22 kind of, like, reports of, you know, like, analyzing a
23 single feature at the jail, maybe like a ramp or some
24 railings or something?

Page 24

1  A  Have I ever, like, visualized it?
2  Q  No, have you ever seen any, like, a formal,
3  like, report of any kind?
4  A  Yes.
5  Q  And what have you seen?
6  A  I seen the ramp, and I seen --
7  Q  That wasn't what I asked you, Kavarian.  So
8  I asked you have you ever seen any kind of formal,
9  like, put-together, like, a written report, an
10 analysis --
11 A  Oh, no, I haven't seen -- no, I haven't seen
12 the report, like, written.  But like, I've seen, like,
13 pictures, like -- like, what you mean, like that?
14 Q  No.  So if the answer is no, the answer is
15 no.  Have you ever seen a formal report about the ramp
16 or any features at the jail?
17 A  No.
18 Q  Okay.  By the way, also, do you have any
19 images in front of you right now?
20 A  Yes, sir.
21 Q  Can I see the images you have in front of
22 you?  And which ramp is that, if you know?
23 A  Right here is the Cermak ramp.
24 Q  Okay.  And what's the other image you have?

Page 25

1  A  The tunnel, RTU tunnel.  RTU.
2  Q  Yeah, can I see?
3  A  Sure.
4  Q  Okay.  And that's the RTU one, you say?
5  A  Yes.
6  Q  And those are the ramps that we're talking
7  about right now, that we've been discussing that
8  you've had issues with, that you said you've fallen
9  on, right?
10 A  Yes, sir.
11 Q  Okay.
12 A  This is the one that was difficult for me
13 with my walker and everything, like, going up -- going
14 up and down this one with my walker and everything.
15 And I'm -- and I'm not having assistance supported
16 from my weak side.  'Cause I be really needing support
17 for my weak side, you know, 'cause this arm, it really
18 can't grab my walker.  But -- but me being forced to
19 use it, I just put it on my walker, and I just -- I
20 got to move.  But I ain't trying to catch no tickets,
21 but sometimes I still caught tickets.
22       MR. MORRISSEY:  And for the record,
23 Mr. Rogers was holding up a picture of the Cermak
24 ramp.

Page 26

 1  BY MR. STILLMAN:
 2   Q   Yeah, okay.  So is it fair to say you're
 3  familiar with, like, the RTU ramp and the tunnels
 4  under the RTU, and the Cermak tunnels and ramp?
 5   A   Yes, sir.
 6   Q   How frequently do you have medical
 7  appointments right now?
 8   A   I have medical appointments, like -- like,
 9  right now, I been filling out medical slips almost,
10  like, since I been back right here.  For almost three
11  weeks, I been filling out medical slips constantly.
12  Like, I probably got, like, seven, eight medical slips
13  that I filled out since I been back, and ain't none of
14  them getting replied to.  So -- at most, before this,
15  I be getting medical attention, like, but --
16   Q   When was the last time you were on, like,
17  the RTU tunnel ramp -- RTU ramp?
18   A   Like, June, or, like, little bit right
19  before June, I was up that ramp.  And then I was
20  recently up this ramp, like -- like, four day -- like,
21  a week -- like, a week ago, and maybe, like --
22   Q   Oh, go ahead, sorry.
23   A   And like, maybe, like, I been up this ramp
24  several times, like, a lot of times recently, too.

Page 27

 1   Q   A week ago, where were you headed that you
 2  used -- which ramp did you use a week ago, the RTU
 3  ramp?
 4   A   Yes, I was using the RTU ramp -- RTU ramp.
 5   Q   And where were going when you did that?
 6   A   I was going to the eye doctor.
 7   Q   So you also used the Cermak ramp that day,
 8  correct?
 9   A   Yes, sir.
10   Q   If you used it the other day, that would've
11  been with your wheelchair, correct?
12   A   Yes, sir.
13   Q   Did you find it any easier to --
14   A   Yeah, I found it -- I found it easier,
15  'cause, like, I got assistance once, like, the -- it
16  was the sheriff.  He assisted me with this -- with
17  this one.  I just went, like -- 'cause my right side,
18  he seen it was difficult for me to get up, so he just
19  pushed me.
20   Q   And have you ever -- before when you were --
21  strike that.
22       When you still had your walker, would you
23  say, like, the angle was the hardest part, or, like,
24  the steepness of the ramp was the hardest part for

Page 28

 1  you?
 2   A   Yes, like, going up.  Going up, that was the
 3  hardest part, traveling up the ramp with my walker.
 4   Q   And did you ever complain to anyone, like
 5  any officers, that you needed any assistance, or you
 6  needed any, like, additional features on the ramp to
 7  help you traverse it?
 8   A   Oh, yeah, I complained multiple times to the
 9  officers, but --
10   Q   And what would those complaints look like?
11  Would that be, like, a verbal complaint, grievances,
12  what would that be?
13   A   A verbal complaint here and grievances,
14  both.
15   Q   You did file grievances about this issue?
16   A   Yes, sir.
17   Q   How many grievances do you think you filed
18  about this?
19   A   I filed a lot of grievances.  I filed a lot.
20   Q   About this issue, or just in general?
21   A   Probably like -- probably like 10, 15
22  almost.
23   Q   Just about this issue?
24   A   About this issue, about -- about 10 -- about

Page 29

 1  10, 11 almost, yeah.
 2   Q   Okay.  And by "this issue" do you mean,
 3  like, just in general, like, medical stuff and, you
 4  know, your mobility implements, or do you mean, like,
 5  these ramps, this ramp?
 6   A   Like, with my medical -- I mean, as in,
 7  like, ramps, 10, but with my medical and everything,
 8  probably like -- probably like 70, at the most -- at
 9  the least, if I'm not mistaken, like 70.
10   Q   So when you've used the RTU tunnel, the RTU
11  ramp, or the Cermak ramp, did you ever, you know, did
12  you ever struggle and have any issues, and they just,
13  instead of taking you to your destination, you know,
14  they just took you back to the tier?  Have your
15  struggles with the ramp ever kind of stopped you from
16  getting to a destination?
17   A   Not -- not stopped me from going to, like,
18  my -- my Stroger appointment.  I had a Stroger
19  appointment one time, and I couldn't get the proper
20  transportation for it, 'cause, like, my walker wasn't
21  cutting it.  And I'm telling them, like, "I'm tired.
22  I'm not trying to go until I get provided assistance"
23  So I couldn't get a cart, so I missed my --
24  appointment.  I can't remember the exact date.

Page 30

1  Q   But that was, like, they -- the jail had
2  administrative issues there, and, like, couldn't
3  transport you, essentially, correct?
4       MR. MORRISSEY:  Objection,
5  mischaracterizes testimony.
6       You can respond.
7  BY MR. STILLMAN:
8  Q   I mean, as far as -- let me reword it.
9       That was, like, administrative as far as,
10 you know, not having the correct transportation method
11 for you on that day, and also you never left your
12 tier, correct?
13 A   No.
14 Q   Yeah, okay.  So have you ever been, you
15 know, mid-transportation and struggled with the ramp
16 or any other feature, and then just been turned around
17 and taken back to your tier because they didn't want
18 to deal with your struggles?
19 A   Yes.
20 Q   That has happened?
21 A   Yes, that happened.
22 Q   Using the RTU and Cermak ramps?
23 A   No, sir.  No, sir, not going to use the RTU
24 ramps.  I was already housed in Division 9, and I was

Page 31

1  trying to get to my -- what's his name appointment --
2  my Stroger appointment.  And I couldn't make it,
3  'cause the transportation was -- they said my walker
4  is going to slow them up, so they don't have enough
5  time.
6  Q   So other than time with Stroger, when you
7  never left the tier, have you ever left the tier and,
8  you know, been mid-transportation, on your way to an
9  appointment or destination, and then, you know, your
10 struggles just stopped the journey?  They turned you
11 around, they said, "We're not going to help you; you
12 got to go back if you're going to struggle like this"?
13 A   No, sir.
14 Q   If you've ever struggled, like, on the
15 ramps, in the tunnels, they've -- maybe they try to
16 push you along, but they've never turned you around
17 and just told you, "Nope, if you can't make it, you're
18 not going."  Right?
19 A   No, sir.
20 Q   Okay.  So you've never, like, actually been
21 held back from any appointments, services, whatever
22 else, like, offerings from the jail because of your
23 struggles with mobility on the ramp; correct?
24      MR. MORRISSEY:  Objection,

Page 32

1  mischaracterizes testimony.
2       You can respond.
3  BY MR. STILLMAN:
4  Q   Same question, does that -- have you ever
5  been held back from going to any appointment,
6  services, or any other jail destination because of
7  your struggles with the ramps?
8  A   I don't recall it.
9  Q   What was that?
10 A   I can't remember.
11 Q   Okay.  And when you say you can't remember,
12 you can't remember if you --
13 A   I can't remember the exact dates.  I can't
14 remember them days that I miss it.
15 Q   But right before that, you said it's never
16 happened that you were turned around
17 mid-transportation, so I mean --
18 A   I'm probably just getting confused a little
19 bit, like, 'cause I feel like you talking too fast,
20 like --
21 Q   Were you ever told by any staff in the jail
22 that you shouldn't be using either the RTU or Cermak
23 ramps?
24 A   No, sir.

Page 33

1  Q   In your use of the Cermak or the RTU ramps,
2  I know you said you fell one time; that was on the
3  Cermak ramp, you said; correct?  Is that correct that
4  it was on the Cermak ramp that you fell?  Mr. Rogers?
5  A   Excuse me?
6  Q   Is it correct that it was on the Cermak ramp
7  that you fell?
8  A   It's the tunnel.  I fell in the tunnel.
9  Q   Which tunnel?
10 A   I don't know the exact tunnel.  I fell in
11 the tunnel, though.
12 Q   In one of the pictures you have?
13 A   No, sir.
14 Q   Oh, it's not in one of those tunnels?  Do
15 you know where the fall was?
16 A   Like -- like, right by court.  It was right
17 by court.  I was coming -- I was actually coming from
18 court; so the day I had court, I fell in the tunnel.
19 And that's when I had my cane order.
20 Q   This is when you had a cane?
21 A   Yes, I had a cane order.
22 Q   Okay.  So I guess, on these ramps, on the
23 Cermak and RTU ramps, in those tunnels pictured right
24 in front of you, have you ever actually experienced

Page 34

1 any injuries on there; did you ever hurt yourself?
2  A  No, just -- no, just pain, no, not no -- not
3 no -- it was just pain, far -- far as these two
4 pictures right here, just all pain.  I never fell,
5 though.
6  Q  No falls on those ramps.  And have you ever
7 gotten treatment for that pain?
8  A  Like, they give me Tylenol.
9  Q  And how would you get treated for that; how
10 would you get Tylenol, for, like, a treatment for that
11 pain?
12  A  I just ask the nurse, and I get some
13 Tylenol.
14  Q  Would you tell them what the pain was from,
15 or what it was related to?
16  A  Just -- I just point out that -- that it was
17 my legs.
18  Q  Would you say, like, "Oh, my legs in
19 relation to, like, my use of the ramp," or just, "My
20 legs are hurting"?
21  A  My legs hurt.
22  Q  Okay.  So that pain would just be the full
23 extent of, kind of, your injuries from the ramp;
24 correct?

Page 35

1  A  Yes, sir.
2  Q  And then, as opposed to any of the pain that
3 you've kind of gotten as a result of your use of the
4 ramp, you know, other injuries you've gotten at the
5 jail, your fall, your seizure, any kind of health
6 issues, injuries that have occurred to you, Cermak has
7 treated those; correct?  Cermak or Cook County Health,
8 like, as a whole, you know, if they send you out to
9 Stroger or wherever else; correct?
10         MR. MORRISSEY:  Objection to form of
11 the question.
12         You can respond.
13 BY MR. STILLMAN:
14  Q  I can reword it.  Would you like me to
15 reword that?
16  A  Yes.
17  Q  So as opposed to, like, the pain from using
18 the ramp, Cook County Health and Cermak have continued
19 to treat your other medical issues, you know, your
20 non-use of the side of your body, your seizure the
21 other day; these have all been treated by Cermak and
22 Cook County Health; correct?  Or they sent you out, at
23 least, to get treatment?
24  A  Yeah, they sent me out to get treatment.

Page 36

1  Q  And so you said you do ask officers for
2 assistance when you're traversing the ramp, both now
3 and before the wheelchair, correct?
4  A  Yes, sir.
5  Q  So would you request assistance when you
6 were using the walker or the cane?
7  A  I mean, I -- I done requested a couple
8 times.
9  Q  And what would it look like, or what would
10 happen when you would request assistance when you were
11 using the walker or the cane on these ramps?
12         MR. MORRISSEY:  Objection, asked and
13 answered.
14         You can respond.
15         THE WITNESS:  I mean, like, some of
16 them do, some of them don't.
17 BY MR. STILLMAN:
18  Q  I mean, what would assistance look like,
19 though?  Would they get a wheelchair for you, drive
20 you in the cart?
21  A  Oh, yeah, they did give me a cart.
22  Q  That would happen often, they would get the
23 cart?
24  A  The two officers that did it for me.  But

Page 37

1 most of them, I just got to go -- I just got to, so I
2 don't miss -- miss important stuff.
3  Q  And did any of those officers ever refuse to
4 assist you?
5  A  I mean, only -- only in 10, when I was in --
6 when I was coming from court, that -- when I fell in
7 the tunnel that one time over there at court with my
8 cane.
9  Q  So how many grievances do you have in front
10 of you right now?
11  A  I don't have no grievances right now.
12  Q  You don't have any in front of you right
13 now?
14  A  No, I left them all in the tier.
15  Q  Okay.  And you said before you think you
16 filed, like, 12 grievances?  Or I think the number was
17 either 8 or 12 about the ramps, correct?
18         MR. MORRISSEY:  Objection,
19 mischaracterizes testimony.
20 BY MR. STILLMAN:
21  Q  You can tell me what number it was; that
22 might be wrong number.
23  A  Like 10 or 15 grievances, I felt, far as the
24 Cermak ramp and tunnel.

10 (Pages 34 - 37)

Page 38

1  Q  And do you know if you got responses on all
2  those grievances?
3  A  Yeah, I -- I got response to most of them.
4  Q  Were all of those grievances valid
5  grievances, or did they mark a lot of those
6  noncompliant about the same issues?
7  A  They would say it was noncompliant, though,
8  but they never did anything, like, to prevent it from
9  happening.
10  Q  You said they would say it was noncompliant?
11      MR. MORRISSEY: Objection,
12  mischaracterizes testimony.
13      MR. STILLMAN: I'm just trying to hear
14  what he said.
15  BY MR. STILLMAN:
16  Q  Could you repeat your answer?
17      MR. MORRISSEY: Do you want to have the
18  court reporter read back his response?
19      MR. STILLMAN: Sure.
20      THE REPORTER: One moment.
21      MR. MORRISSEY: Mr. Rogers, they're
22  going to read back what you said, okay?
23      THE WITNESS: Yes, sir.
24      THE REPORTER: Okay.

Page 39

1      MR. MORRISSEY: I think it was about
2  grievances, about whether they were compliant or
3  noncompliant. That was the question that I believe
4  Mr. Stillman asked to have read back.
5      THE REPORTER: All right. One moment.
6      (The reporter repeated the record as
7      requested.)
8      THE REPORTER: Okay. That was the
9  question and answer.
10      MR. MORRISSEY: Thank you.
11      MR. STILLMAN: Okay. I'm sorry, I'm
12  going to ask the same question again, because I don't
13  really know what your answer was.
14      So that's kind of why I was asking,
15  Pat, to be honest. I mean, I --
16  BY MR. STILLMAN:
17  Q  Did they mark multiple grievances of yours
18  noncompliant or not?
19  A  No.
20  Q  Okay. Thank you. And if I told you that
21  there weren't 10 to 15 grievances about the ramp,
22  where would you say they've gone?
23      MR. MORRISSEY: Objection to the form
24  of the question.

Page 40

1      You can respond, Mr. Rogers.
2      THE WITNESS: I don't know where they
3  gone. I don't -- I don't know where they gone.
4  BY MR. STILLMAN:
5  Q  Okay.
6  A  If they ain't in the files, 'cause I turn
7  them in every time I go -- I go directly to -- and
8  turn them in in the box. So if they ain't in the box,
9  I don't understand.
10  Q  And do you think there's any possibility
11  that maybe you could be overstating the amount of
12  grievances about this ramp, or the ramps, that you've
13  done?
14  A  No, sir.
15  Q  Okay. We're going to look at the first
16  grievance that I'll call Exhibit 1.
17      (Exhibit 1 was marked for
18      identification.)
19      Can everyone see that?
20      MR. MORRISSEY: Zach, you're going to
21  have to blow it up, because I'm pretty far back.
22      Mr. Rogers, can you --
23      MR. STILLMAN: I mean, I'm zooming in.
24  But everyone can see that, just to start, yeah?

Page 41

1      MR. MORRISSEY: Yeah, it's better.
2      Can you see it, Mr. Rogers?
3      THE WITNESS: Yes, sir.
4  BY MR. STILLMAN:
5  Q  And this is one of your grievances, correct?
6  A  Yes, sir.
7  Q  This says control number 202113934, correct?
8  A  Yes, sir.
9  Q  13934, it's a little more legible there on
10  the second page. So this is your grievance, correct;
11  you drafted this?
12  A  Yes, sir.
13  Q  And that's your signature on the bottom?
14  A  Yes, sir.
15  Q  Do you remember drafting this grievance?
16  A  Yes.
17  Q  And this grievance, essentially, says that
18  on October 13, 2021, Sergeant Wray came to the deck
19  and confiscated your cane which you use to walk around
20  the tier due to your limited mobility. And you said
21  the order came from ADA Sabrina, and Nurse O., who
22  were both aware of your injury, correct?
23  A  Yes, sir.
24  Q  And the date of the incident was 10/13/21;

Page 42

1 that right?
2  A  Yes.
3  Q  And the names of the people you're accusing
4 here are ADA Sabrina, Nurse O., Sergeant Wray, and
5 Sergeant Bochniak, correct?
6  A  Yes, sir.
7  Q  And then shows here that your grievance was
8 picked up on 10/14, correct?
9  A  Yes, sir.
10  Q  This would be the response to your
11 grievance, correct?
12  A  Yes, sir.
13  Q  Page 2 here, and the response says that you
14 have an order for -- it says, "Dear Mr. Rogers, you
15 have a current and active order for a cane long
16 distance only," right?
17  A  Yes, sir.
18  Q  And that says that Susan Shebel responded to
19 your grievance on 11/2/21, correct?
20      MR. MORRISSEY:  My objection's you just
21 didn't read the whole response.
22      But you can respond, Mr. Rogers.
23 BY MR. STILLMAN:
24  Q  Honestly, I -- I mean, I can try and read

Page 43

1 this.  But it just says, "Dear Mr. Rogers, thank you
2 for bringing this issue to our attention.  You have a
3 current and active alert for a cane long distance
4 only, use --" and then I can't read the rest of it, to
5 be completely honest.
6      MR. MORRISSEY:  I think that says,
7 "health service request long distance for further
8 health care needs," perhaps.
9      MR. STILLMAN:  Yeah, I believe it; that
10 sounds accurate.
11 BY MR. STILLMAN:
12  Q  And it says here you declined to sign the
13 grievance when you got it back, correct?  I can zoom
14 in, if you need, more.  It says, "Detainee declined to
15 sign, 12:55 p.m. 11/8/21," correct?
16  A  I don't remember.
17  Q  Does it say that right there, "The detainee
18 declined to sign, 12:55 p.m."?
19  A  Yes, sir.
20  Q  11/8/21, it says that, correct?
21  A  Yes, sir.
22  Q  Would you have any reason to doubt that or
23 say that's probably not truthful?
24  A  I don't know why I would decline to sign a

Page 44

1 grievance, but I don't remember that.
2      MR. MORRISSEY:  We've been going about
3 an hour.  I'm going to use the bathroom, so if we have
4 a five-minute break?
5      MR. STILLMAN:  Yeah.
6      MR. MORRISSEY:  I'll have to ask the
7 officer for permission.
8      MR. STILLMAN:  That's fine.
9      MR. MORRISSEY:  Do you need to go to
10 the bathroom, Mr. Rogers?
11      THE WITNESS:  Yes, sir.
12      MR. MORRISSEY:  Is five minutes enough
13 for you to get over there?
14      THE WITNESS:  No, 'cause I got to
15 use -- I need, like, ten minutes.
16      MR. MORRISSEY:  All right.  So we'll
17 come back in ten minutes.
18      MR. STILLMAN:  Okay.  So let's call it,
19 like, 35, 36.  10:36.
20      MR. MORRISSEY:  That's fine.
21      THE REPORTER:  We are now off the
22 record for a break at 10:26 a.m.
23      (Off the record.)
24      THE REPORTER:  Okay.  We are back on

Page 45

1 the record at 10:37 a.m.
2 BY MR. STILLMAN:
3  Q  All right.  I'm sharing what we'll call
4 Exhibit 2 on screen.
5      (Exhibit 2 was marked for
6       identification.)
7      I'll zoom in momentarily, but can you see
8 this document, Mr. Rogers?  Are you able to see it?
9  A  Yes.
10  Q  Okay.  And this is another grievance from
11 you, correct?
12  A  Yes, yes.
13  Q  And this is grievance control number
14 2023X18872, correct?
15  A  Yes.
16  Q  And it says the stated date of this
17 grievance is 12/21/23, correct?
18  A  Yes.
19  Q  In this one, you say the date of the
20 incident is December 11, 2023 and ongoing, referring
21 to the location as the Cook County Criminal Court
22 Building/Cook County Department of Corrections.  And
23 you state that you attended court at the criminal
24 building, and you need a walker to your ADA

Page 46

1  conditions. There's a ramp there that makes it
2  difficult for you to get up and down, and it's
3  painful. Am I reading this correctly?
4      A   Yes, sir.
5      Q   It's not accessible for any IIC with ADA
6  conditions. The above names has an unconstitutional
7  policy, custom, and practice of not creating
8  conditions or accommodating conditions for IICs in
9  their custody with canes, walkers, or other ADA
10 conditions, not making the criminal court building
11 accessible for inmates with ADA conditions, and being
12 deliberately indifferent to the needs of IICs with ADA
13 conditions, and causing IICs with ADA conditions
14 unnecessary pain and embarrassment; is that correct?
15     A   Yes, sir.
16     Q   And that's the only page of this, as far as
17 the content of your grievance, here, correct? The
18 next page is the response, right?
19     A   Yes.
20     Q   And then you signed this grievance; that's
21 your signature right there?
22     A   Yes.
23     Q   And you remember drafting this?
24     A   Yes, sir.

Page 47

1      Q   And then it was picked up on 12/23/23,
2  correct?
3      A   Yes, sir.
4      Q   Do you remember getting a response on this
5  one?
6      A   Yes, sir.
7      Q   And their response there says -- well, their
8  response was dated on January 1, 2023, and it says,
9  "Upon review of available evidence, and speaking with
10 deputy who escorted you up and down the ramp, CCSO
11 policy was followed. And at no time did Rogers have
12 difficulty ambulating up or down the ramp, and at no
13 times did Rogers fell -- or -- yeah, he was having --"
14     A   Yes, sir.
15     Q   And that was from Sabrina at the Sheriff's
16 Office, correct?
17     A   Yes, sir.
18     Q   And you received that response on 1/10/24
19 and signed for it, right?
20     A   Yes, sir.
21     Q   And then you appealed it, stating that --
22 could you read your response in the appeal?
23     A   "No one escorted me, which I highly --
24 escorted me, which I highly needed to walk the ramp --

Page 48

1  walk up the ramp or any other movements due to injury
2  of my TBI they continued to neglect."
3      Q   And then their response essentially says
4  that their original response is to stand, right?
5      A   That's what most of my response say,
6  noncompliant, as far as this situation.
7      Q   You said most of your responses say
8  "noncompliant"?
9      A   Some -- well, this situation, where we -- I
10 grieved this issue numerous times, so it can't be -- I
11 can't keep grieving the same issue.
12     Q   So, Kavarian, I asked you earlier if they
13 ever marked any grievances that you filed for this
14 issue with noncompliant, and you said no, didn't you?
15     A   Yes.
16     Q   So you're saying --
17     A   Maybe I didn't understand the question when
18 you asked me.
19     Q   So have you ever received a noncompliant
20 response on a grievance filed in this issue?
21     A   And I can't reply -- I can't respond to it.
22 I can't write the same grievance multiple times.
23     Q   So I'm asking you, have you ever gotten a
24 response from the jail on any of your grievances

Page 49

1  regarding the ramps that it was noncompliant?
2      A   Not as I remember.
3      Q   A minute ago, you just said that most of the
4  responses on this issue say that they're noncompliant,
5  didn't you?
6      A   Mm-hmm.
7      Q   So have you ever received a response from
8  the jail on a grievance filed about a ramp issue
9  stating that it's noncompliant?
10     A   I don't think about this issue, no.
11     Q   All right. Putting on the screen Exhibit 3,
12 declaration.
13         (Exhibit 3 was marked for
14         identification.)
15     This is your declaration, correct?
16     A   Yes, sir.
17     Q   Did you have a part in drafting this?
18     A   Yes, sir.
19     Q   Did you personally draft this, or did you --
20 I mean, did you write it out yourself and send it to
21 your attorney?
22     A   No, sir, I just gave my attorney this
23 information. 'Cause my right side is kind of -- hard
24 for me to write certain stuff, so that's why I was --

13 (Pages 46 - 49)

Page 50

1  Q   And would you have, like, talked to him,
2  talked to your attorneys over the phone about the
3  content of this declaration?
4  A   Yeah, like -- like, my attorney come see me.
5  I let him know -- I let him know all this when he came
6  to see me.
7  Q   Okay. And on the second page, here, that's
8  your signature, above "Kavarian Rogers" right there?
9  A   Yes, sir.
10 Q   And you signed that on June 1, 2024?
11 A   Yes, sir.
12 Q   Okay. And it says here -- I'm going to read
13 it and somewhat paraphrase; just tell me if I'm doing
14 so correctly. Your name's Kavarian Rogers. You're
15 incarcerated at Cook County Jail under booking number
16 20200402015, correct?
17 A   Yes, sir.
18 Q   In February 2020, you were shot in the left
19 side of your head; that injury substantially impacts
20 your ability to use the right side of your body, and
21 you have limited ability to move your right hand and
22 right leg. It's extremely difficult for you to move
23 from place to place because of those injuries,
24 correct?

Page 51

1  A   Yes, sir.
2  Q   You are substantially limited in the ability
3  to move from place to place, unless you are provided
4  an assistive device. The correctional staff generally
5  let you use a walker when you leave Division 9 to
6  travel to other parts of the jail campus, including
7  the Cermak building, correct?
8  A   Yes, sir.
9  Q   And that would've been before you had your
10 seizure, correct, that would've been true, right?
11 A   [Unintelligible response.]
12 Q   Pardon?
13 A   Can you say it one more time?
14 Q   Yeah, that would've been, like, before your
15 seizure, and you were assigned a wheelchair; that
16 would've been when this number 3 would've been more
17 correct, right?
18 A   Yes, sir.
19     MR. MORRISSEY: Objection,
20 mischaracterizes testimony.
21     MR. STILLMAN: Well, your client just
22 said, "Yes, sir," but all right.
23 BY MR. STILLMAN:
24 Q   I mean, right now, are you using a walker to

Page 52

1  leave Division 9 to travel to other parts of the jail
2  campus?
3  A   Right now?
4  Q   Yeah, like, at present, in your time in the
5  jail right now, are you using a walker and leaving
6  from Division 9?
7  A   No, sir.
8  Q   You're in the RTU right now, correct?
9  A   Yes, sir.
10 Q   So this portion of number 3 right here would
11 generally be not as correct right now? It was more
12 correct before your seizure; is that right?
13 A   Yes, sir.
14 Q   Okay. Thank you. Number 4 says you have
15 travelled up and down the east tunnel ramp located in
16 the lower level of the RTU and the Cermak ramp. It is
17 painful for you to traverse those ramps using your
18 walker; the ramps are both steep and long, correct?
19 A   Yes, sir.
20 Q   And then finally, over the past few months,
21 you have traversed the Cermak ramp several times. It
22 is very difficult for you to travel up and down using
23 your walker. There is no place to safely rest when
24 you go up or down with your walker. You have

Page 53

1  requested staff to help you go up and down the ramp,
2  and even filed a grievance. Despite these requests,
3  staff direct me to move up and down the ramp with my
4  walker; is that right?
5  A   Yes, sir.
6  Q   And do you have any reason to dispute or
7  change anything in this declaration or say it's not
8  true anymore, other than what we already talked about
9  in number 3?
10     MR. MORRISSEY: Objection, to the
11 extent you're suggesting it was not true when he
12 signed it.
13     MR. STILLMAN: I'm not suggesting it's
14 not true when it was written. I didn't say that.
15     All right. Forget about it.
16 BY MR. STILLMAN:
17 Q   When you were still in your walker, about
18 how mobile were you at that time? Were you able to
19 move around a little more easily than you've been able
20 to since your seizure?
21     MR. MORRISSEY: Objection to form.
22     You can respond.
23 BY MR. STILLMAN:
24 Q   Were you able to move around a little bit

Page 54

1 more easily before the seizure, Kavarian?
2   A   Yeah.
3   Q   And one of your complaints in your grievance
4 was that you had a cane that was taken, correct? Is
5 that right?
6   A   No, I think my wheelchair was taken. Oh,
7 yeah, my cane was taken, too.
8   Q   Yeah, the first grievance we went over
9 together, that was about your cane being taken,
10 correct, confiscated?
11  A   Yeah.
12  Q   All right. I'm putting on the screen
13 Exhibit 4.
14      Or actually, when you were using the cane,
15 Kavarian, do you think it was something you were using
16 very actively for, like, mobility purposes?
17  A   Yeah. Yes, sir.
18  Q   Like, something you really needed to get
19 around, you couldn't make your way around the jail
20 without it?
21  A   Yes.
22  Q   Did you ever get into fights involving your
23 cane?
24  A   Like -- like, you mean, like -- like -- did

Page 55

1 I -- did I, like -- my -- use my cane?
2   Q   Yeah, did you ever use your cane in a fight?
3   A   I mean, no, sir. I mean, I mostly used it,
4 but I never got a chance to use it.
5   Q   You never threatened to use your cane and
6 hit people with your cane? Would there be incident
7 reports involving any kind of incidents like that?
8       MR. MORRISSEY: Objection to form.
9       You can respond.
10      THE WITNESS: There shouldn't be.
11 BY MR. STILLMAN:
12  Q   So I'm putting on the screen Exhibit 4.
13      (Exhibit 4 was marked for
14       identification.)
15      Are you able to see this document?
16  A   Yes, sir.
17  Q   That's an incident report, right?
18  A   Yeah.
19  Q   And it states here that, "Inmate Rogers,
20 Kavarian was walking towards inmate Jones with a cane.
21 When he got closer, Kavarian raised up his cane
22 towards Jones, Hamilton and turns Jones' direction,
23 and then both inmates grabbed each other;" is that
24 right?

Page 56

1   A   Yes, sir.
2   Q   Did that seem like a time where you were
3 using your cane in a fight?
4   A   Yes, sir. Yeah, well, I told you I never
5 used it, though. I never got a chance to use my cane.
6   Q   Okay. Do you know the other plaintiff in
7 this case, William Mathis? Or the plaintiff in this
8 case, William Mathis?
9   A   No, sir.
10  Q   Have you ever heard the name Cuauhtemoc
11 Hernandez?
12  A   No, sir.
13  Q   What about the name Kent Elwoods?
14  A   No, sir.
15  Q   Sylvestor Brinson?
16  A   No, sir.
17  Q   Tommy Love?
18  A   No, sir.
19  Q   Anthony Muniz?
20  A   No, sir.
21  Q   Antoine Pierce?
22  A   No, sir.
23  Q   What about Carlos Martinez?
24  A   No, sir.

Page 57

1   Q   Lonell Long?
2   A   No, sir.
3   Q   Joseph Smith?
4   A   No, sir.
5   Q   Quovotis Harris?
6   A   No, sir.
7   Q   James Krook?
8   A   No, sir.
9   Q   And Raasikh Phillips?
10  A   No, sir.
11      THE REPORTER: I'm sorry, just for a
12 clear record, all those answers were no, correct?
13      THE WITNESS: Yes, ma'am.
14      MR. STILLMAN: All right. I got
15 nothing else.
16      MR. MORRISSEY: Sir, just I have a few
17 questions. So you don't have to turn around if it's
18 too hard for your neck, okay?
19      THE WITNESS: Yes, sir.
20          EXAMINATION
21 BY MR. MORRISSEY:
22  Q   When Mr. Stillman asked you questions, you
23 mentioned there's two types of seizures?
24  A   Yes, sir.

15 (Pages 54 - 57)

Page 58

1    Q   What's the difference between those two
2 types, to your knowledge?
3    A   Like, the grand mal seizures, like, I could
4 just space out and forget things. And my grand mal
5 seizures, like, I could go all the way out and, like,
6 go to lose my right side, my -- my right side and go
7 to the hospital, things like that. Wake up, don't
8 know what happened.
9    Q   What's the other type of seizure?
10   A   Epilepsy.
11   Q   And what does that mean to you?
12   A   Like, sometimes I could just space out and
13 lose memory.
14   Q   Since you've been at the jail, since 2020,
15 have you had both types of seizures?
16   A   Yes, I had lots.
17   Q   How many different types of -- I mean -- let
18 me rephrase the question.
19       Approximately how many seizures do you
20 believe you've had over the last four years?
21   A   Like, in two -- including both?
22   Q   Right.
23   A   Like 15.
24   Q   So prior to the seizure that caused you to

Page 59

1 be here a few weeks ago, you've had prior seizures?
2    A   Yes, sir.
3    Q   Now, can you explain in greater detail how
4 this gunshot wound has impacted the right side of your
5 body, pertaining to moving from place to place or
6 walking?
7    A   Like, from detail to detail? Like, I got to
8 use my left arm and my left foot to get me place to
9 place if I'm not being, like, pushed, or have -- if I
10 don't have support from someone to push me, because,
11 like, I can't move my arm to -- it don't have motion
12 to -- to wheel it, to push the wheel forward and
13 forward, and --
14   Q   What about when you use canes or walkers?
15   A   Like, I got a -- it's hard for me, like, to
16 grab a -- grab a hold on it to use it with one hand,
17 'cause my -- my right hand don't really be allowing me
18 to grab it.
19   Q   And can you explain, when you use a cane or
20 a walker -- be able to move your right leg and your
21 right foot?
22   A   Like -- like, I would need to move my left
23 leg. Like, my right foot, it don't really do as much,
24 'cause it's, like it's all still asleep, and none of

Page 60

1 it will wake up yet, so -- from my injuries.
2 Sometimes it -- it'll get a little bit of mobility in
3 it, but it's still haven't wake up. So I won't be
4 able to really move my right side.
5    Q   And over the past two or three years, on
6 some days, have you been able to have better mobility
7 with your right side?
8    A   Yes, yes, I have, just a little bit.
9    Q   Does it decrease and increase?
10   A   Yeah, it -- it'll decrease sometimes, like,
11 and then it'll go back up. It's like, the effort that
12 I put in, I try to gain a little bit, but not too much
13 come back.
14   Q   I'm sorry, I didn't mean to cut you off.
15   A   It's already been, like, four years, so
16 like -- still it ain't came back. Like, I don't
17 really feel like too much therapy will, like, to help
18 me -- like, to get back to where I need to be.
19   Q   Have you requested therapy?
20   A   Yeah, I requested therapy a lot of times,
21 but I wasn't in the building to get therapy. I was in
22 a different division, so I couldn't get therapy I
23 needed.
24   Q   When you were in Division 9, did you request

Page 61

1 to be moved to different buildings because of your
2 disability?
3    A   Yeah, I requested multiple times on
4 grievances, like, can I -- can I get adequate
5 placement and assistance due to my medical needs, and
6 my medical -- I -- grievances and things like that so
7 that I can get a better result, and a outcome to be
8 able to move around and get active, far as, like,
9 physical therapy.
10   Q   You mentioned in response to Mr. Stillman's
11 questions you had problems with the showers. Can I --
12   A   Yeah, I had -- I had mostly the problem with
13 the showers in Division 9. Like, most -- it was a
14 couple times I had to sit on the floor wash up. But
15 some of the showers got mold in them, so I really
16 stopped sitting on the floor. I just go to the back
17 of the alley and just wash up.
18   Q   Did you have problems using the toilet in
19 Division 9 because of your -- limitation?
20   A   Yeah, one time I -- like, 'cause I can't
21 grab a toilet, ain't no grab bars over there, so one
22 time I fell off the toilet. And -- ain't got too many
23 assistants in Division 9, though, but I filed
24 grievances and stuff. They -- they don't really do

Page 62

1 nothing.
2  Q  Now, talking about your right leg and your
3 right part of your body, do you experience foot drop?
4  A  Yes, I got drop foot in my right foot.
5  Q  And how long have you had -- what is drop
6 foot to you, Mr. Rogers?
7  A  I got a drop -- like, I -- I got to drag my
8 leg, and when -- when I move it, it just -- it do what
9 it want, like, it do whatever it want to me.  It don't
10 got no real motion to it.
11  Q  And how does that impair your ability to use
12 a cane or a walker?
13  A  'Cause, like, it's -- it's difficult to me.
14 Like, I can't really -- I can't really move with it,
15 so I got to use one side to -- bring this side to do
16 most of it, like, and take my time with everything,
17 really.
18  Q  Have you had that foot -- is it called foot
19 drop?
20  A  Yeah.
21  Q  Have you had drop foot for four years?
22  A  I had this since 2020, yeah.
23  Q  Now, during the examination, you told
24 Mr. Stillman that there was a time when you didn't go

Page 63

1 to a Stroger medical appointment because the officer
2 wouldn't move you in a cart?
3  A  Yeah, in a cart, I requested a cart.
4  Q  Can you walk us through what happened on
5 that day, explain to us what happened?
6  A  Like, really, I -- I requested a cart about
7 me bringing -- about me being in pain.  Like, I'm
8 telling them, like, "Man, I don't want to walk all the
9 way to court this time.  Like, can you give me a
10 cart?"  One officer gave it to me, and then this
11 officer -- this officer told me, like, he can't give
12 it to me 'cause it's part of protocol or something.
13 It don't be -- something like -- like they only could
14 give it to me for, like --
15  Q  And where were you when you had this
16 conversation with staff?
17  A  I was --
18      THE REPORTER:  Sorry, could you please
19 repeat?
20      THE WITNESS:  I was in the bull pen
21 downstairs of Division 9, right before I left off for
22 court.
23 BY MR. MORRISSEY:
24  Q  So when you had this conversation, you were

Page 64

1 moved from your living unit to the bull pen in the
2 basement of Division 9 to be transported?
3  A  I was already downstairs in the basement,
4 trying to get them to take me on the cart to court.
5 And I asked them, and they -- it ain't happen.
6  Q  Now, you previously said you missed a
7 Stroger appointment; was it Stroger, or was it court
8 when you asked for the cart?
9  A  It was -- it was court.
10  Q  Since your seizure a few weeks ago, has your
11 condition improved at all, your physical?
12  A  Not to -- not in my previous seizure.  It
13 just got a little, like -- I just feel better.  But
14 physical, no -- ain't nothing --
15      MR. MORRISSEY:  I have nothing further.
16      MR. STILLMAN:  I got nothing.
17      THE REPORTER:  Okay.  For transcript
18 orders?
19      MR. MORRISSEY:  We'll waive signature.
20 I don't need a copy of this right now.
21      MR. STILLMAN:  Yeah, we'll take a copy.
22      THE REPORTER:  Okay.  We are now off
23 the record at 11:05 a.m.
24      (Signature waived.)

Page 65

1      (Whereupon, at 11:05 a.m., the
2      proceeding was concluded.)

```
                                                    Page 66
 1            CERTIFICATE OF DEPOSITION OFFICER
 2       I, CARLY HEMBERGER, the officer before whom
 3   the foregoing proceedings were taken, do hereby
 4   certify that any witness(es) in the foregoing
 5   proceedings, prior to testifying, were duly sworn;
 6   that the proceedings were recorded by me and
 7   thereafter reduced to typewriting by a qualified
 8   transcriptionist; that said digital audio recording of
 9   said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.
17                       CARLY HEMBERGER
18                 Notary Public in and for the
19                      State of Illinois
20
21
22
23
24
```

```
                                                    Page 67
 1              CERTIFICATE OF TRANSCRIBER
 2       I, SARAH JOHNSON, do hereby certify that
 3   this transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise intereste                      ion.
13
14
15                     SARAH JOHNSON
16
17
18
19
20
21
22
23
24
```

18 (Pages 66 - 67)